Robert B. REICH, Secretary of Labor, Plaintiff–Appellee,

v.

INTERSTATE BRANDS CORPORATION, Defendant–Appellant.

No. 94–3835.

United States Court of Appeals, Seventh Circuit.

Argued May 8, 1995.

Decided June 15, 1995.

John H. Secaras, Sol. Gen., David S. Fortney, Phyllis B. Dolinko, Joan E. Gestrin, Dept. of Labor, Chicago, IL, Joan Brenner (argued), William J. Stone, Dept. of Labor, Office of the Sol., Washington, DC, for Robert Reich.

Stuart H. Bompey, John D. Giansello (argued), Orrick, Herrington & Sutcliffe, New York City, Leonard Singer, Bioff, Singer &

Finucane, Kansas City, MO, for Interstate Brands Corp.

Before POSNER, Chief Judge, and EASTERBROOK and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Shoppers make their largest purchases of baked goods on Saturday and Monday. To supply fresh products, bakeries are open on Friday and Sunday. Bakery workers' traditional work week has been Monday, Wednesday, Thursday, Friday, and Sunday. In 1972 the bakery workers' union staged a nationwide strike to back up its demand for weekly schedules with two consecutive days off. The employers were unyielding, fearing that a change would impair the freshness of the products on the main shopping days and thus dampen consumer demand. The strike ended with a compromise: workers got higher wages, and employers retained their right to require work without consecutive days off—but employers have to pay a price for exercising the privilege. An employer who gives any worker a schedule that does not include two consecutive days off in a given week must pay $12 per worker per week into a fund. In November of each year the employer distributes these "earned work credits" (as the collective bargaining agreement calls them) to all workers still on the payroll, according to the number of weeks each went without two-day breaks.

Ever since 1972 the collective bargaining agreement has provided that these $12 credits are not compensation for work performed but are "penalties" designed to induce employers to provide consecutive days off. The agreements say that the payments are not part of the base wage on which overtime pay is calculated. For two decades the Secretary of Labor apparently accepted that understanding; federal audits came and went without any challenge to the implementation of the program. In 1991, however, the Secretary reversed course and filed this suit, contending that the $12 payments are part of the employees' "regular rate" for purposes of § 7(a)(1) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207(a)(1). The district court granted summary judgment for the Secretary and entered an injunction requiring Interstate Brands Corporation to treat the $12 payments as part of the employees' regular compensation. 849 F.Supp. 1261 (C.D.Ill.1994). The Secretary did not seek an award of back pay; the relief is entirely prospective, which makes us wonder why anyone is excited. In the long run the parties can adjust the collective bargaining agreement to provide a little lower hourly rate (or a lower rate of increase at the next reopening) so that both employees and employers are indifferent between the current system and treating the $12 payments as part of the "regular rate." This litigation therefore appears to be about formal rather than functional issues. Nonetheless, we plow ahead because adjustment may be delayed or the employees themselves may sue for back wages; substance may lurk behind the form.

Some figures may help clarify the discussion that follows. Suppose bakery workers work 48 weeks per year, receiving an hourly wage of $10, and always put in five days per week. Half the weeks they get consecutive days off, and the other half they work on Monday, Wednesday, Thursday, Friday, and Sunday. The employer sets aside $288 per employee. Let us assume that the employer experiences 20% turnover, so by year's end each of the remaining employees is entitled to $360 from the kitty (those who leave in mid-year get nothing). If the employees labor 40 hours a week and never work overtime, then everything is straightforward: the employer disburses $360 to each. Now let's add overtime. According to the bakery, every overtime hour during the year earns time-and-a-half ($15 per hour). The Secretary, by contrast, believes that the $360 paid at year's end is part of the "regular rate." Forty hours a week for 48 weeks is 1920 hours. The $360 must be allocated to these hours, at 18.75¢ per hour (360 ÷ 1920 = .1875). The "regular rate" then is $10.1875 per regular hour, and the bakery must pay $15.28125 per overtime hour. For a baker who put in 100 overtime hours a year and was paid $15 per overtime hour during the year, the bakery owes an extra $28.125, and the check at year's end should be for $388.13 rather than $360. A baker who clocked more

than 100 overtime hours would get more, and one who worked no overtime would settle for the $360. An employee who worked the M–W–Th–F–Su schedule three-quarters of the time, and was entitled to $540 at year's end, would have a reconstructed "regular wage" of $10.28 and a reconstructed overtime rate of $15.42. This employee would be entitled to an extra $42 for 100 hours of overtime and should receive $582 in the closing settlement. Other schedules would be handled in the same fashion.

 Things would get even more complicated if the employer had to estimate during the year how many weeks each employee would be entitled to the $12 credit in order to predict the final "regular wage" and pay the full overtime wage in each paycheck. So far as the FLSA is concerned, however, employer and employee may agree to deferred payment of wages to the extent they exceed the minimum wage. *Calderon v. Witvoet,* 999 F.2d 1101, 1107–08 (7th Cir.1993) (dictum); see generally *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). Although the "general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends", 29 C.F.R. § 778.106, nothing in the FLSA prevents a collective bargaining agreement from providing a different rule. The Secretary believes that "[w]hen the correct amount of overtime compensation cannot be determined until some time after the regular pay period," a retroactive adjustment is proper. *Ibid.;* see also 29 C.F.R. §§ 778.209, 778.303. The Secretary has not challenged the deferral mechanism in the baking industry's collective bargaining agreements, and we therefore assume that bakeries are entitled to compute and pay retrospectively, as in these examples.

Section 7(e) defines the "regular rate" to include "all remuneration for employment paid to, or on behalf of, an employee". The $12 credit, whether or not designed as a "penalty," is "remuneration for employment" and counts unless it comes within one of § 7(e)'s many exemptions. Interstate Brands relies entirely on § 7(e)(2), which excludes

payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause; reasonable payments for traveling expenses, or other expenses, incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer; and other similar payments to an employee which are not made as compensation for his hours of employment[.]

According to Interstate Brands, the $12 credit is a "payment[ ] to an employee which [is] not made as compensation for his hours of employment".

The Secretary offers two responses that do not persuade. First is that the $12 credit is "compensation for . . . hours of employment" because it goes to bakers who work six-day weeks. That simply misunderstands the arrangement. The payment is due whenever the work schedule fails to provide consecutive days off. Consider two weekly schedules: M–Tu–W–Th–F and M–W–Th–F–Su. Each has five days and 40 hours, but only the latter draws the $12 credit. (Interstate Brands adds that $12 goes into the pot whenever an employee receives a M–W–Th–F–Su *schedule,* even if changes provide consecutive days off.) This difference in compensation for schedules having the same number of days and hours per week is the foundation of the bakery's argument.

█ The Secretary's other argument is that "similar" means "rare" or at least "infrequent," which disqualifies a credit that applies to a majority of employee weeks. Our difficulty here is that vacation pay and reimbursement of expenses, the other principal subjects of § 7(e)(2), are not infrequent by any understanding. Many employees receive reimbursements for expenses. Most collective bargaining agreements provide for an ample program of holidays and personal vacations, the value of which swamps the payments for "earned work credits." Congress has not delegated to the Secretary of Labor the power to interpret § 7 of the FLSA; he appears today as a prosecutor, much as the Attorney General does when enforcing the antitrust laws. Although courts should ex-

tend respect to the Executive Branch of government as it tries to chart a sensible course of implementation, see *Atchison, Topeka & Santa Fe Ry. v. Pena,* 44 F.3d 437, 445–47 (7th Cir.1994) (en banc) (concurring opinion), we are not obliged to "defer" in the strong sense. See *Adams Fruit Co. v. Barrett,* 494 U.S. 638, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990). Instead we give the Secretary's bulletins the respect their reasoning earns them. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *Roland Electrical Co. v. Walling,* 326 U.S. 657, 676–77, 66 S.Ct. 413, 421–22, 90 L.Ed. 383 (1946); cf. *Condo v. Sysco Corp.,* 1 F.3d 599 (7th Cir.1993). None of the Secretary's interpretive bulletins justifies the equation of "similar" in § 7(e)(2) with "infrequent." His brief is equally silent, and the novelty of the position suggests that his predecessors may have had different, but equally unarticulated, understandings. Recall that many waves of compliance audits in the baking industry did not draw a protest until 1991. A regional administrator filed an affidavit saying that despite appearances the Department of Labor had not changed policy. The district court was incredulous. We need not inquire when the Secretary first adopted the view he expresses in this case, because a public prosecutor is entitled to forgo prosecution, in order to make use of resources elsewhere, without contracting the scope of the statute. An unexplained period of non-prosecution, followed by an equally unexplained decision to prosecute, deprives us of a persuasive interpretation, however, and our own examination of the statute does not accord with the Secretary's current reading of "similar."

■ Although we are unimpressed with the Secretary's understanding of § 7(e)(2), we are not exactly bowled over by the bakery's. Interstate Brands wants us to disregard "similar" and exclude from § 7(e) any payment "not made as compensation for ... hours of employment", which the bakery understands to mean "not measured by the number of hours spent at work". Excising a word from a statute is sometimes appropriate—for Congress sometimes cobbles together laws in a fashion that slights linguistic precision—but a litigant who wants to redact a statute needs to show that the context

requires this step. Cf. *Hubbard v. United States,* — U.S. —, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995); *Rowland v. California Men's Colony,* — U.S. —, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993). If Interstate Brands is right, then employers can evade the overtime requirements with ease. Imagine this compensation system: $52 (paid at year's end) for every day on which work is scheduled, plus the minimum wage for every hour actually worked. If the minimum wage is $3.50, this system produces $80 ($10 per hour) for an ordinary 8–hour day. It also yields an overtime rate of $5.25 per hour, roughly *half* of the average hourly wage rather than one and a half times the average wage. Interstate Brands chose a lower flat payment ($12 per week rather than $52 per day), but if the former is exempt under § 7(e)(2), then the latter has a good claim to equal treatment. Yet if the latter is an implausible understanding of the FLSA, why is Interstate Brands' system exempt?

■ We cannot read § 7(e)(2) in isolation, as the bakery invites us to do. See *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001–02, 108 L.Ed.2d 132 (1990); *Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 310 (7th Cir.1986). It is one among many exemptions, and a glance at a few of the others shows that § 7(e)(2) cannot possibly exclude every payment that is not measured by the number of hours spent at work. Consider § 7(e)(3)(a), which excludes bonuses from the computation of the "regular rate," but only when

> both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly[.]

A $2,000 year-end bonus for all employees, like the year-end distribution of accumulated $12 credits, is independent of the number of hours worked. Yet under § 7(e)(3)(a) the bonus must be included in the "regular rate" unless it is entirely discretionary with the employer—which the disbursement of the $12 credits is not. See *Walling v. Stone,* 131

F.2d 461 (7th Cir.1942); 29 C.F.R. §§ 778.210, 778.212(b). Interstate Brands would have us believe that *Minizza v. Stone Container Corp.*, 842 F.2d 1456 (3d Cir.1988), understands § 7(e)(2) to exclude bonuses that do not qualify under § 7(e)(3)(a). Doubtless the subsections of § 7(e) are not mutually exclusive; that a payment cannot be excluded under one subsection does not imply that every other subsection is inapplicable. But we hesitate to read § 7(e)(2) as a catch-all, one that obliterates the qualifications and limitations on the other subsections and establishes a principle that all lump-sum payments fall outside the "regular rate," for then most of the remaining subsections become superfluous. *Minizza* does not treat them so. Union and employer resolved a dispute with an agreement to make two lump-sum payments. The third circuit treated these payments as equivalent to sums received in litigation rather than as compensation for work; this conclusion does not imply that all lump-sum payments negotiated in the collective bargaining process are excluded from the "regular rate." That there was a strike in 1972 cannot detract from the fact that the baking industry's accommodation involves long-term, planned distributions of a kind dissimilar to the one-time distribution in *Minizza*. It may be, as Interstate Brands stresses, that modern bakers are not in need of the FLSA to protect them from intolerable hours of work and penurious wages, but the overtime provisions of the FLSA apply without regard to the level of the standard wage. The genesis of the FLSA lay in a desire to improve the welfare of unorganized, low-wage employees, see *Brooklyn Savings Bank*, 324 U.S. at 707 n. 18, 65 S.Ct. at 902 n. 18, but as is true with so many statutes the scope of the FLSA far outruns its original justification. There is no collective-bargaining exemption from the FLSA.

The $12 credits may be paid in a lump sum, but the right to receive them is tied to work schedules that employees dislike. They are akin to premium wages for working weekends, or the night shift, or in noisy plants. Section 7(e)(7) deals directly with premium wages, excluding from the "regular rate"

extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract or collective-bargaining agreement, for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek (not exceeding the maximum workweek applicable to such employee under subsection (a)[)], where such premium rate is not less than one and one-half times the rate established in good faith by the contract or agreement for like work performed during such workday or workweek.

Section 7(e)(6) contains a similar provision for weekend work. So if a baker's regular weekday rate were $10 and the rate for Sunday work were $15, the Sunday premium would not be figured back into the "regular rate," and time-and-a-half pay for overtime during the week would remain at $15. But if the Sunday rate were $14, the extra pay would be included in the "regular rate," raising the overtime rate for both weekdays and Sundays. *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 68 S.Ct. 1186, 92 L.Ed. 1502 (1948); *Longshoremen's Union v. National Terminals Corp.*, 50 F.Supp. 26 (E.D.Wis. 1943), affirmed, 139 F.2d 853 (7th Cir.1944). It is awfully hard to see why things should differ if the employer chooses to pay a "Sunday bonus" in a lump sum. If the bonus is high enough to take the Sunday hourly wage over 150% of the weekday wage, then § 7(e)(7) keeps it out of the "regular rate"; but if it is not high enough, the manner of its payment cannot sensibly make a difference.

All of this suggests an understanding of the word "similar" in § 7(e)(2). The list preceding the phrase "other similar payments to an employee which are not made as compensation for his hours of employment" includes vacation pay, other compensation for hours not worked, and reimbursement of expenses. The word "similar" then refers to other payments that do not depend at all on when or how much work is performed. An extra payment made because the workplace is unpleasant, or the hours irregular, is no different in principle from a higher base rate compensating the employee for smelly or

risky tasks, foul-tempered supervisors, or inability to take consecutive days off. By comparison, "call-back pay," or compensation for abbreviated rest between work periods, has some potential for exclusion under § 7(e)(2), as 29 C.F.R. § 778.222 provides. Call-back pay does not depend on the inconvenience of the ordinary schedule or even of the hours in the second slot; it is paid even if the second shift is 9–5 on a weekday (indeed, even if the second shift is a single hour). We need not decide whether § 778.222 is a proper reading of § 7(e)(2) to be confident that earned work credits in the bakery industry are analogous to premium rates for "bad" shifts. Whether paid contemporaneously in the hourly wage or deferred and treated like a bonus, compensation for working an unpleasant or inconvenient schedule should be handled under the terms of § 7(e)(7).

> The district courts injunction reads:
>
> The defendant, Interstate Brands Corporation, is permanently enjoined from treating "earned work credits" as "other similar payments" under 29 U.S.C. Section 207(e)(2) exempt from calculation as part of the "regular rate of pay" and the overtime rate of pay.

This is correct as far as it goes, but our analysis implies that the reference to § 7(e)(2) is an important limit. The district court did not compel Interstate Brands to include the $12 credits in the "regular rate." Although § 7(e)(2) does not apply, it is potentially necessary to use the framework of § 7(e)(7). Suppose a baker's regular weekday wage is $10 per hour and the stated wage for Sunday work is $14. The $12 "earned work credit" amounts to an extra $1.50 per hour for an eight-hour day on Sunday. Figuring this credit back into the Sunday rate would yield $15.50 per hour, a premium wage more than 150% of the regular weekday wage, and the $12 credit then would be shielded by § 7(e)(7). What is more, the extra 50¢ would be credited toward overtime compensation for weekday work under § 7(h). See *Alexander v. United States,* 32 F.3d 1571 (Fed.Cir.1994). This is only an illustration; we have not attempted to apply § 7(e)(7) to the actual collective bargaining agreement, because Interstate Brands has not argued that the application of § 7(e)(7) would make a difference and therefore has forfeited any benefit of that subsection in this litigation. All we hold today is that § 7(e)(2) does not keep the $12 credits out of the "regular rate." How the earned work credits should be treated under § 7(e)(7) and (h) is a subject that may become important in any follow-on litigation seeking back pay, and the effect of these subsections is open for decision then.

AFFIRMED.