981 P.2d 854 (1999)
John LUNDBORG, Respondent,
v.
KEYSTONE SHIPPING COMPANY, Petitioner.
No. 65673-8.
Supreme Court of Washington, En Banc.
Argued January 12, 1999.
Decided July 29, 1999.
*855 Robert Bocko, Seattle, for Petitioner.
John W. Merriam, Seattle, for Respondent.
Kevin B. Smith, Seattle, Amicus Curiae on Behalf of the Chamber of Shipping of America.
TALMADGE, J.
We are asked in this case to decide if John Lundborg, a seaman injured on board ship, is entitled to additional compensation from his employer for his injury. We hold Lundborg may not recover additional "unearned wages"[1] beyond what he was already paid by the employer because his entitlement to wages was for the length of the voyage or *856 employment and his employment ended shortly after his injury when the vessel docked in Portland. We further hold there is a question of fact as to whether a collectively bargained rate of $8 per day illegally abrogated Lundborg's ancient entitlement to maintenance, the expenses of food and lodging for injured sailors. We remand the case to the trial court for further proceedings consistent with this opinion.

ISSUES
1. Does a rate of $8 per day for maintenance, a living allowance for food and lodging for injured seamen, effectively abrogate the right to maintenance even though the rate was negotiated pursuant to a collective bargaining agreement (CBA)?
2. Where a seaman agreed to employment for a voyage, did the seaman's voyage conclude for purposes of his entitlement to wages when the vessel, an oil tanker, finished its voyage from Anacortes to Portland?

FACTS
John Lundborg was an able seaman[2] aboard the SS Star Rhode Island, an oil tanker owned by Texaco Refining and Marketing, Inc. (Texaco). Texaco sold the ship in June 1995, and, as a result, Lundborg's employment with Texaco ended. The new owners of the SS Star Rhode Island retained the Keystone Shipping Company (Keystone) to manage the ship, now renamed the SS Keystone Rhode Island. Lundborg remained aboard the ship after the sale and contracted to serve as an able seaman for Keystone. Accordingly, Lundborg executed a new employment contract with Keystone entitled "Shipping Articles for Coastwise Trade" (shipping articles).[3] These shipping articles expressly stated Lundborg's term of employment "shall be for one voyage and with agreement of both Master and seaman for successive voyages, but not exceeding twelve months in all." Clerk's Papers at 486.
Lundborg sailed on the SS Keystone Rhode Island from Anacortes, where it loaded a cargo of oil. The ship docked in Portland, where it discharged its cargo. While on duty on July 8, 1995, Lundborg tripped over a hose on the deck of the ship and injured his ankle. Due to his injury, he disembarked from the vessel to see a doctor. The doctor declared Lundborg unfit for duty. Lundborg returned to the ship on July 8 and "signed off articles," leaving the employ of the ship. He remained unfit for duty for 24 days. Keystone paid Lundborg all his wages through July 8.
Lundborg was a member of the National Marine Union, which had a CBA with Keystone providing an injured seaman would receive maintenance at the rate of $8 per day. Keystone also paid Lundborg $8 in maintenance for each day he was unable to work. It did not, however, pay him any unearned wages because it claimed the ship's voyage and Lundborg's employment had ended in Portland on July 8 because the ship had docked and discharged its cargo at that point.
Lundborg sued Keystone in King County Superior Court under the Jones Act (46 App. U.S.C.A. § 688 (1998)) and general maritime law alleging Keystone owed him unearned wages. He also alleged he was entitled to maintenance in an amount sufficient to pay for room and board on land at least equal to that which he had received on board ship.[4] An arbitrator ruled against Lundborg on all of his claims. Lundborg appealed and in a trial de novo, the trial court granted Keystone's motion for summary judgment on both the unearned wages and maintenance issues. Lundborg appealed *857 the trial court's decision to the Court of Appeals, Division One, which affirmed on the unearned wages issue, but reversed on the maintenance issue. Lundborg v. Keystone Shipping Co., 89 Wash.App. 886, 950 P.2d 1014 (1998). On cross-petitions for review, we granted review of both the maintenance and unearned wages issues.

ANALYSIS
A. MAINTENANCE
The right to maintenance is an incident of maritime employment dating from the middle ages. GRANT GILMORE & CHARLES BLACK, JR., THE LAW OF ADMIRALTY 281 (2d ed.1975).
The doctrine of maintenance and cure has been part of British admiralty law since 1150 when Eleanor of Guienne brought France's sea codes, the Laws of Oléron, to England. The Laws of Oléron addressed every facet of admiralty voyages, from obtaining vessels to crew requirements, and were cited as authority in the admiralty courts of England. During his reign, King Richard I [The Lion-Hearted] of England adopted the Laws of Oléron and formally recognized the seaman's right to maintenance and cure.
Virginia A. McDaniel, Note, Recognizing Modern Maintenance and Cure as an Admiralty Right, 14 FORDHAM INT'L L.J. 669, 672 (1991) (footnotes omitted). Since men first went down to the sea in ships, ship owners have had an obligation to provide maintenance to seamen who became ill or who were injured while in the service of a ship. Gardiner v. Sea-Land Serv., Inc., 786 F.2d 943, 945 (9th Cir.), cert. denied, 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986).
The duty to provide maintenance and cure was first introduced into American maritime law by Justice Story in Harden v. Gordon, 2 Mason 541, 11 F. Cas. 480, 482-83 (No, 6,047) (C.C.D.Me.1823), and was further refined by the United States Supreme Court in The Osceola, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760 (1903). Congress subsequently recognized the traditional maritime right to maintenance and cure in the Shipowners' Liability Convention of 1936, 54 Stat. 1693, which was ratified by the United States Senate and made effective by a proclamation of President Franklin D. Roosevelt on October 29, 1939. See Farrell v. United States, 336 U.S. 511, 517, 69 S.Ct. 707, 710, 93 L.Ed. 850 (1949).
Seamen, who do not enjoy the right of worker compensation or industrial insurance as do land-based employees, receive maintenance while ashore recovering from injury or illness; maintenance is a living allowance for food and lodging. Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993 (1938). Additionally, seamen are entitled to cure, which is the right to necessary medical services. Vaughan v. Atkinson, 369 U.S. 527, 531, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962). The right to maintenance and cure extends to the point of maximum recovery or maximum cure, that is, the point at which the seaman's condition becomes fixed or the seaman is capable of returning to work. Id.[5]
The United States Supreme Court in Aguilar v. Standard Oil Co., 318 U.S. 724, 727, 63 S.Ct. 930, 932, 87 L.Ed. 1107 (1943), indicated maintenance serves three purposes: (1) to protect the poor and improvident seaman while ill in foreign ports; (2) to encourage ship owners to protect the seaman's safety and health while in service; and (3) to induce employment in the merchant marine.
The very nature of maintenance and the rate at which it must be paid have been discussed in numerous cases. As the United States Court of Appeals for the Ninth Circuit stated in Gardiner:
The duty to provide maintenance is imposed by law. Cortes v. Baltimore Insular Line, 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932) (per Cardozo, J.). The obligation is said to be an incident of the status of the seaman, and "contractual" only in that the obligation has its source in the employment relationship. Id. Although courts have sometimes characterized *858 the duty as an "implied contract provision," see, e.g., Aguilar v. Standard Oil Co., 318 U.S. 724, 730, 63 S.Ct. 930, 934, 87 L.Ed. 1107 (1943), they have consistently held that the right to maintenance cannot be abrogated by contract, Cortes, 287 U.S. at 371, 53 S.Ct. at 174.
Case law defines the extent of the right to maintenance, and how it is measured. The seaman is entitled to food and lodging of the kind and quality of that which he would receive aboard ship. Calmar S.S. Corp., 303 U.S. at 528, 58 S.Ct. at 653. Traditionally, the right was restricted to actual out-of-pocket expenses. Gilmore and Black at 305; Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468 (1948). However, more recent cases have awarded a flat per diem rate without further inquiry. Gilmore and Black at 307. A rate of $8.00 per day was judicially established in the late 1940's. Id. Apparently that rate has been continued down to the present time in many places, both as the rate to be paid to individual non-union seamen and the rate frequently established in collective bargaining agreements. Very recently, the $8.00 rate has been successfully challenged in cases involving individual non-union seamen. See, e.g., Incandela v. American Dredging Co., 659 F.2d 11, 14 (2d Cir.1981).
Gardiner, 786 F.2d at 946.
In Gardiner, the United States Court of Appeals for the Ninth Circuit held a collective bargaining agreement between a union and a shipping company providing maintenance of $8 per day was enforceable because, considering the entirety of the collective bargaining agreement, the $8 rate was negotiated and did not constitute an abrogation of the seaman's historic right to maintenance. In a strong dissent, Judge Bette Fletcher disagreed, contending $8 per day hardly reflected the real cost of food and lodging for an injured seaman. A number of other federal circuit courts of appeals agree with the Gardiner majority's position, although the United States Supreme Court has yet to resolve the circuit court conflict. Macedo v. F/V Paul & Michelle, 868 F.2d 519, 522 (1st Cir.1989) (agreed upon maintenance rate in a CBA enforceable); Baldassaro v. United States, 64 F.3d 206, 212-13 (5th Cir.1995) (rejecting a seaman's claim that a CBA's maintenance rate of $8 per day was unreasonable and so insufficient as to abrogate his right to maintenance); AlZawkari v. American S.S. Co., 871 F.2d 585, 588 (6th Cir. 1989) ("the maintenance per diem rate, like any other benefit, which is the ultimate result from give and take collective bargaining between the parties, should be binding on them"); see also Grove v. Dixie Carriers, Inc., 553 F.Supp. 777, 781 (E.D.La.1982) ("if there exists a valid collective bargaining agreement between the seaman's Union and his employer, which expressly sets forth the rate of maintenance to be paid a seaman employee should he become ill or injured, then the Plaintiff, as a party to that agreement, will be bound by its terms").
However, many other courts disagree. See Barnes v. Andover Co., L.P., 900 F.2d 630 (3d Cir.1990); Brown v. United States, 882 F.Supp. 1424 (S.D.N.Y.1995); Bachir v. Transoceanic Cable Ship Co., 1998 WL 831035 (S.D.N.Y. Nov. 24, 1998); Covella v. Buchanan Marine, Inc., 1996 WL 164482 (S.D.N.Y. Apr. 9, 1996); Gillikin v. United States, 764 F.Supp. 261 (E.D.N.Y.1991); Brown v. State, 816 P.2d 1368 (Alaska 1991); Daniels v. Standard Marine Transp. Serv., Inc., 177 Misc.2d 944, 680 N.Y.S.2d 41 (N.Y.App. Term 1998). These courts have emphasized that a union collective bargaining agreement may not abrogate the historic right of seamen to maintenance. If $8 per day is below the going local rate for maintenance, then a CBA providing for only $8 per day constitutes an unlawful abrogation of the seaman's right to maintenance.
Relying on Gardiner and concurring authorities, Keystone argues the $8 per day rate was negotiated by the union on Lundborg's behalf and represents a quid pro quo exchange during the bargaining process. Keystone further argues because some maintenance was paid and the right to maintenance was not entirely eliminated, we can determine the $8 per day rate of maintenance was adequate as a matter of law. By contrast, Lundborg provided testimony below that the actual cost for his food and *859 lodging in Portland at the time of his injury was $900 per month. Clerk's Papers at 34.[6]
The $8 per day rate for maintenance that found its way into collective bargaining agreements in the 1940's is inconsistent with the rate of maintenance for nonunion seamen. Nonunion seamen receive maintenance at a rate closer to the realities of today's market. See Incandela v. American Dredging Co., 659 F.2d 11, 14 (2d Cir.1981) (maintenance rate of $26.80 acceptable).
Clear and well-established principles of general maritime law aid the resolution of this case. First, provision of maintenance is an incident of a seaman's service on board a ship and is a duty imposed by law. It generally stands in the place of worker compensation or industrial insurance laws, which Congress has never seen fit to provide for seamen by statute.[7] Second, the historic right to maintenance may not be abrogated by contract:
When the seaman becomes committed to the service of the ship, the maritime law annexes a duty that no private agreement is competent to abrogate, and the ship is committed to the maintenance and cure of the seaman for illness or injury during the period of the voyage, and in some cases for a period thereafter.
De Zon v. American President Lines, 318 U.S. 660, 667, 63 S.Ct. 814, 87 L.Ed. 1065 (1943). Accord Barnes v. Andover Co., 900 F.2d 630, 636 (3d Cir.1990); Baldassaro v. United States, 64 F.3d 206, 212 (5th Cir. 1995), cert. denied, 517 U.S. 1207, 116 S.Ct. 1823, 134 L.Ed.2d 929 (1996). Thus, collective bargaining agreements regarding maintenance may be enforced so long as they do not abrogate the right to maintenance. Maintenance is properly measured as payments for food and lodging of the kind and quality the seaman received aboard ship.
Keystone argues sound federal policy requires support for collective bargaining agreements. See, e.g., 29 U.S.C.A. § 151 (1998) (declaring policy of United States to encourage "the practice and procedure of collective bargaining"). See also Restaurant Employees v. Rhodes, 90 Wash.2d 162, 165, 580 P.2d 611 (1978) (recognizing "strong federal labor policy which favors written labor contracts and also favors their enforcement" (citations omitted)).
We agree federal policy wisely encourages collective bargaining. But invalidating collective bargaining provisions that abrogate the right to maintenance does not amount to an assault on the federal policy favoring collective bargaining. A collective bargaining provision that purports to annul a law of the sea that has existed for nearly a thousand years cannot stand. "Courts have an established role in protecting seamen under the general maritime law. That role long antedates even the existence of a national labor *860 policy and of collective bargaining. If the law of labor relations is to supplant that judicial role, it is for Congress to say so." Brown v. United States, 882 F.Supp. 1424, 1427 (S.D.N.Y.1995).
Moreover, in a wide variety of contexts, employment contracts that abrogate federally mandated rights are unenforceable. Indeed, unless specifically allowed by statute, worker compensation benefits are never subject to amendment by collective bargaining agreements. For instance, the Longshore and Harbor Workers' Compensation Act (LHWCA) provides, "No agreement by an employee to waive his right to compensation under this chapter shall be valid." 33 U.S.C.A. § 915(b) (1998). See Lawson v. Standard Dredging Co., 134 F.2d 771 (5th Cir.1943) (holding employment contract that waived benefits under the LHWCA in favor of state worker's compensation benefits invalid). The Federal Employers' Liability Act, 45 U.S.C.A. §§ 51-60 (1998), which applies to railroad workers, contains a similar prohibition: "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void." 45 U.S.C.A. § 55 (1998). There has been no controversy about the meaning of this section over the last 84 years. See Taylor v. Wells Fargo & Co., 220 F. 796 (5th Cir.1915).
Likewise, even in the absence of a statutory prohibition against agreements or contracts that waive statutory rights, the United States Supreme Court has long held invalid contracts in violation of the minimum wage and overtime requirements set by the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C.A. §§ 201-219 (1998): "Any custom or contract falling short of that basic policy, like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights." Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 602-03, 64 S.Ct. 698, 88, L.Ed. 949, 152 A.L.R. 1014 (1944). The Court later said:
This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act. Thus, we have held that FLSA rights cannot be abridged by contract or otherwise waived because this would "nullify the purposes" of the statute and thwart the legislative policies it was designed to effectuate. Moreover, we have held that congressionally granted FLSA rights take precedence over conflicting provisions in a collectively bargained compensation arrangement.

Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 740-41, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (emphasis added) (citations and footnote omitted). Accord Reich v. Interstate Brands Corp., 57 F.3d 574, 578 (7th Cir.1995) ("There is no collective-bargaining exemption from the FLSA."), cert. denied, 516 U.S. 1042, 116 S.Ct. 699, 133 L.Ed.2d 656 (1996); Galvin v. National Biscuit Co., 82 F.Supp. 535, 537 (S.D.N.Y.1949) (Rifkind, J.) ("Neither contract nor custom can open an avenue of escape from the obligations imposed by the Fair Labor Standards Act.").
Washington state laws governing the rights of workers also invalidate contracts that would waive such statutory rights. Our industrial insurance act contains the following provision:
No employer or worker shall exempt himself or herself from the burden or waive the benefits of this title by any contract, agreement, rule or regulation, and any such contract, agreement, rule or regulation shall be pro tanto void.
RCW 51.04.060. Numerous other states have similar statutes or court rules to the same effect.[8] Our Minimum Wage Act *861 (MWA), chapter 49.46 RCW, specifically permits collective bargaining agreements to establish wages, but only so long as those wages are in excess of the applicable minimum under the MWA. RCW 49.46.110.
In summary, there is an extensive landscape of federal and state law dealing with the rights of workers holding that collective bargaining agreements do not supersede and cannot abrogate rights the law accords to workers. A CBA is not impervious to these numerous expressions of public policy, both statutory and court made, that accord greater solicitude to the legal rights of workers.
General maritime law accords to seamen the right to maintenance. The United States Supreme Court, the ultimate arbiter of general maritime law, in a holding binding on this Court, has stated contracts may not abrogate the right to maintenance. The only question left, then, is whether an award of $8 a day abrogated Lundborg's right to maintenance.
The fundamental flaw in this case so far is the courts below evaluated the maintenance issue as a matter of law. The trial court determined as a matter of law on summary judgment the collective bargaining rate of $8 per day for maintenance must be enforced and that low rate did not abrogate Lundborg's right to maintenance. Similarly, the Court of Appeals ruled as a matter of law an $8 per day maintenance amount was invalid because "[a]n $8 per day rate is tantamount to abrogation because this amount of money is patently inadequate." Lundborg v. Keystone Shipping, Co., 89 Wash.App. 886, 891, 950 P.2d 1014 (1998). We cannot determine as a matter of law whether the $8 per day rate in the collective bargaining agreement is adequate or inadequate.
If indeed the measure of maintenance is a payment of expenses for food and lodging of a kind and quality received on board ship, and there is evidence in the record to suggest that such food and lodging would cost much more than $8 per day, it is an issue for the trier of fact as to whether $8 per day is so inadequate as to vitiate the historic right to maintenance afforded sailors under American maritime law, particularly when we know from the Incandela case, decided in 1981, that an appropriate maintenance rate was $26.80 per day.
This case presents a fact question for a trier of fact to resolve. We therefore remand this case to the trial court to determine whether the rate of maintenance paid under the collective bargaining agreement between the National Maritime Union and Keystone constituted such an inadequate rate as to abrogate the historic right to maintenance afforded by Lundborg and other able seamen, and if it did, what Lundborg should receive as the appropriate maintenance amount.
B. UNEARNED WAGES
Unearned wages are the actual wages a seaman did not earn because of his injury or illness. Berg v. Fourth Shipmor Assocs., 82 F.3d 307, 309 (9th Cir.1996). A shipowner has an obligation to pay a seaman who becomes ill or is injured while working upon a ship full wages for the length of the voyage or employment. See Luksich v. Misetich, 140 F.2d 812, 815 (9th Cir.1944); Berg, 82 F.3d at 309. The Court of Appeals held "Lundborg was not entitled to any [unearned] wages when he left the ship [in Portland] after his injury because the ship was at the end of its voyage," and, therefore, it affirmed the trial court's grant of summary judgment in favor of Keystone on this issue. Lundborg, 89 Wash.App. at 892, 950 P.2d 1014. Lundborg contends the Court of Appeals erred because the definition of a "voyage" and the contemplated period of employment are disputed issues of fact for the trier of fact to resolve.
Keystone was obligated under the shipping articles to pay Lundborg for "one voyage." Clerk's Papers at 486 (stating that "[t]he term of employment shall be for *862 one voyage and with agreement of both Master and seaman for successive voyages, but not exceeding twelve months in all"). Thus, Lundborg's employment with Keystone was necessarily indefinite beyond one voyage because, as Keystone correctly points out, neither the shipping articles nor the CBA, guaranteed Lundborg employment beyond one voyage.[9] The general rule is, "in order for [seamen] to establish that they were entitled to unearned wages beyond the end of a voyage, they [are] required to prove the existence of a definite period of employment that extend[s] beyond the end of each voyage." Blainey v. American S.S. Co., 990 F.2d 885, 891 (6th Cir.), cert. denied, 510 U.S. 933, 114 S.Ct. 346, 126 L.Ed.2d 311 (1993). The shipping articles plainly contemplated "one voyage." As a result, we must determine whether the SS Keystone Rhode Island had finished one voyage when Lundborg suffered his injury.
On the day Lundborg was injured, the SS Keystone Rhode Island had finished its voyage from Anacortes to Portland. At the latter city, it docked and discharged its cargo of oil. Keystone contends the ship's voyage was completed at the point the cargo was discharged because under federal statute and established case law, a voyage consists of a trip from one port to the next for cargo operations. Lundborg, as we have noted, asserts the definition of a "voyage" is a question for the trier of fact.
Keystone's contention is correct. 46 U.S.C.A. § 10501(a) (1999) provides, "this chapter applies to a vessel ... on a voyage between a port in one State and a port in another State." (Emphasis added.) The statute means a voyage consists of a trip from one port to the next for cargo operations. The case law also supports this proposition. In Vickers v. Tumey, 290 F.2d 426, 434 (5th Cir.1961), the Court of Appeals for the Fifth Circuit stated the "end of the voyage for this purpose would be the time and place cargo was discharged, or certainly no later than return to her next loading port." (Emphasis added.) Furthermore, in Blainey, the Court of Appeals for the Sixth Circuit stated "it is undisputed that the longstanding custom on the Great Lakes has been to pay unearned wages only to the end of a voyagethat is, a trip from a loading port to an unloading port, or vice versa." Blainey, 990 F.2d at 891. (Emphasis added.) In addition, the Court of Appeals for the Fourth Circuit stated in The Velma L. Hamlin, 40 F.2d 852, 853 (4th Cir.1930), that a voyage terminated "when the cargo was discharged." Finally, in Farrell v. United States, 336 U.S. 511, 520-21, 69 S.Ct. 707, 93 L.Ed. 850 (1949), the United States Supreme Court noted a voyage terminated "at a port of discharge."
In summary, 46 U.S.C.A. § 10501(a) (1998) and cases from the United States Supreme Court and Courts of Appeals for the Fourth, Fifth, and Sixth Circuits confirm the SS Keystone Rhode Island completed its voyage on July 8, 1995, once it docked in Portland and discharged its cargo. Because Lundborg agrees he was fully paid through that date, the Court of Appeals below correctly affirmed the trial court's grant of summary judgment to Keystone on the unearned wages issue.

CONCLUSION
An injured seaman is entitled to unearned wages, maintenance, and cure, the maritime equivalents to land-based worker compensation or industrial insurance. These nonstatutory rights are of ancient lineage and are developed in general maritime law. In this case, Lundborg was paid the unearned wages *863 to which he was entitled. We believe, however, there remains a question for the trier of fact as to whether a contractually negotiated maintenance rate of $8 per day is so paltry in the face of the reality of an injured seaman's actual expenses for land-based food and lodging as to effectively abrogate the right to maintenance. We remand the case to the trial court for further proceedings consistent with this opinion.
GUY, C.J., DURHAM, SMITH, JOHNSON, MADSEN and IRELAND, JJ., concur.
ALEXANDER, J. (concurring in part, dissenting in part).
I agree with the majority that Lundborg may not recover additional "unearned wages" beyond the wages that have already been paid to him by the Keystone Shipping Company (Keystone). I disagree, however, with the majority's conclusion that Lundborg is owed additional maintenance if the trier of fact determines that the maintenance rate provided for in the collective bargaining agreement (CBA) is so low as to constitute an abrogation of "Lundborg's ancient entitlement to maintenance." Majority op. at 856. In my view, the maintenance of $8 per day was properly established in the CBA that was freely entered into by Lundborg's union, the National Marine Union (NMU), and Keystone. The trier of fact should not, therefore, be permitted to supplant the negotiated rate of maintenance with a rate that simply reflects its notion of what the rate should be.
It is important to observe that our national labor laws manifest a strong preference for protecting the collective bargaining process. See 29 U.S.C.A. § 151 (1998) (stating that it is the policy of the United States to "encourag[e] the practice and procedure of collective bargaining"). Indeed, the United States Supreme Court has recognized the importance of collective bargaining and has frowned on efforts of states to interfere with this process. It has explicitly stated that the
ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace. State law which frustrates the effort of Congress to stimulate the smooth functioning of that process thus strikes at the very core of federal labor policy.

Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 104, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962) (emphasis added). This court has echoed the same sentiment, recognizing that there "is a strong federal labor policy, which favors written labor contracts and also favors their enforcement." Restaurant Employees v. Rhodes, 90 Wash.2d 162, 165, 580 P.2d 611 (1978) (citations omitted); see also Trust Fund Servs. v. Heyman, 88 Wash.2d 698, 704, 565 P.2d 805 (1977) (stating that there is a federal statutory policy which favors the "enforcement of collective bargaining agreements").
Unfortunately, the majority disregards the clear mandate of federal statutes and cases, as well as our own case law, and renders an opinion which, in my view, serves to "frustrate[] the effort of Congress to stimulate the smooth functioning of th[e] [collective bargaining] process [and] thus strike[] at the very core of federal labor policy." Local 174, 369 U.S. at 104, 82 S.Ct. 571.
In judicially rewriting a provision in the CBA agreed upon by Keystone and Lundborg's union, the terms of which were freely agreed upon by the contracting parties, the majority pays insignificant heed to the fact that every federal appellate court, save one, that has considered the argument advanced by Lundborg, has rejected it and enforced the maintenance rate set forth in the CBA that those courts were reviewing. See, e.g., Gardiner v. Sea-Land Serv., Inc., 786 F.2d 943, 947 (9th Cir.1986) (holding that "refusal to enforce the collectively-bargained [$8] maintenance rate would vitiate somewhat several of the policies underlying the federal labor laws"); Baldassaro v. United States, 64 F.3d 206, 212-13 (5th Cir.1995) (rejecting a seaman's claim that a CBA's maintenance rate of $8 per day was unreasonable and so insufficient as to abrogate his right to maintenance); Al-Zawkari v. American S.S. Co., 871 F.2d 585, 588 (6th Cir.1989) (holding that "the maintenance per diem rate, like any other benefit, which is the ultimate result from give and take collective bargaining between the parties, should be binding on *864 them"); Macedo v. F/V Paul & Michelle, 868 F.2d 519, 522 (1st Cir.1989) (holding that an agreed-upon maintenance rate in a CBA should be enforced).[1] Indeed, in a lower federal court, the very maintenance provision of the NMU/Keystone CBA that is at issue here was challenged on grounds identical to those raised by Lundborg and was upheld. See Hodges v. Keystone Shipping Co., 578 F.Supp. 620, 622 (S.D.Tex.1983) ("The NMU contract rate is the rate bargained for by the union as part of an overall benefits package. NMU members are to be paid maintenance at the $8 per day rate regardless of actual expenses for food and lodging. Accordingly, the Court finds that [the] plaintiff, as a member of the NMU, is bound by the maintenance rate of $8 per day, as specified in the collective bargaining agreement....").
It is particularly noteworthy that the majority's opinion runs directly contrary to the decision of the Ninth Circuit Court of Appeals in Gardiner v. Sea-Land Service.[2] While this court is not bound by the decision in Gardiner, we should, in my view, give substantial deference to the Ninth Circuit's interpretation of federal maritime law. See In re Personal Restraint of Grisby, 121 Wash.2d 419, 430, 853 P.2d 901 (1993) (stating "we always give careful consideration to Ninth Circuit decisions"); State v. McCormack, 117 Wash.2d 141, 144, 812 P.2d 483 (1991) (stating that "federal Court of Appeals opinions construing federal law are `entitled to great weight' in the state courts") (citing Home Ins. Co. v. Northern Pac. Ry., 18 Wash.2d 798, 808, 140 P.2d 507, 147 A.L.R. 849 (1943)). On a more practical level, the majority's decision will undoubtedly encourage future forum shoppers to initiate similar lawsuits in the courts of this state, secure in the knowledge that they will receive a more favorable result here than in a neighboring federal district court.
The majority's decision is motivated by its conclusion that a seaman may not be able to provide himself or herself with food and lodging for $8 per day and, if that is the case, the CBA has essentially abrogated the seaman's right to maintenance. The majority leaves to the trier of fact the responsibility to determine the adequacy of the agreed upon maintenance rate. While I do not think that the sufficiency of a freely bargained for maintenance rate is properly a fact question for the trier of fact, I must observe that the maintenance provision is not as inadequate as it may appear to be on the surface. I reach that conclusion because the CBA provides that if the seaman "is unable to obtain lodging and subsistence for eight dollars ($8.00) per day, upon request the Company will furnish the same." Clerk's Papers (CP) at 108. This provision should overcome the majority's concern that "there is evidence in the record to suggest that ... food and lodging would cost much more than $8 per day." Majority op. at 860. The majority also ignores the fact that the CBA specifically provides that Keystone must pay for the return transportation of crewmembers whose services are terminated in a port "other than the port of original engagement for legitimate *865 illness or injury." CP at 109-10. Accordingly, an injured seaman is entitled to receive free transportation to their "port of original engagement," presumably the place where the seaman makes his or her home. In such event the seaman would not be in need of other lodging.
Fundamentally though, the majority unwisely accepts Lundborg's policy argument that the $8 per day maintenance rate essentially abrogates the seaman's right to maintenance. The plain fact is that Lundborg's union made a specific choice in its contract negotiations with Keystone to accept a lower maintenance rate in the CBA "in exchange for other benefits and wage concessions."[3] CP at 172 (emphasis added). The record clearly demonstrates that the maintenance rate was the subject of "real bargaining" during the contract negotiations between Keystone and the NMU, because the NMU had, at various times, requested that Keystone increase the maintenance rate. However, "[a]s part of the give and take process involved in the labor negotiations ... the NMU has always conceded on its demand for a higher maintenance rate in exchange for other benefits and wage concessions from the employers in the agreements ultimately reached."[4] CP at 172 (emphasis added). Lundborg, having benefited from those other benefits and wage concessions, should not now be permitted to obtain a higher maintenance rate by the device of having this court judicially rewrite the CBA to provide maintenance in an amount that is satisfactory to the trial judge or jury. In doing just that, the majority, rather than promoting an equitable and legally accurate solution, enables Lundborg to "eat his cake," in the form of substantial benefit and wage concessions, and "have it too," in a higher maintenance rate.
This conclusion is buttressed by the fact that even the Third Circuit, the only circuit that heretofore has supported the argument Lundborg makes here, has conceded that policy considerations may no longer justify the refusal to enforce a specifically bargained for maintenance rate within a CBA. See Barnes v. Andover Co., L.P., 900 F.2d 630, 637 (3d Cir.1990) ("The changed circumstances of the unionized seaman may undercut the rationale supporting the traditional right to maintenance and cure, at least for unionized seamen.").
In sum, both federal law and our own case law strongly favor the enforcement of freely bargained for CBAs. In my opinion, the majority errs in refusing to follow the clear precedent established by the majority of the federal circuits, including the Ninth, which mandates that courts enforce and protect CBAs. This court should refuse to permit rewriting of a provision in the CBA to suit the trier of fact's subjective notions of what is a fair maintenance rate. See Local 174, 369 U.S. at 103, 82 S.Ct. 571 (holding that the state courts are barred from applying individualized local rules when called upon to enforce CBAs); Al-Zawkari, 871 F.2d at 588 ("Courts generally have decided that it is more appropriate for the courts to enforce privately negotiated contractual rates of maintenance, rather than engaging in overt legislation of particular dollar figures.") (emphasis added).
For the aforementioned reasons, I dissent.
SANDERS, J., concurs.
NOTES
[1] "Unearned wages" constitute a component of maintenance and cure. Berg v. Fourth Shipmor Assocs., 82 F.3d 307, 309 (9th Cir.1996). "The term refers to the actual wages the seaman did not earn because of his injury or illness." Berg, 82 F.3d at 309. Unearned wages are those wages he would otherwise have earned from the period of the onset of the injury or illness until the end of the voyage.
[2] We use the archaic masculine form for persons aboard ships throughout this opinion, as it is common usage in the maritime profession.
[3] 46 U.S.C.A. § 10502(a) (1999) mandates that "[t]he owner, charterer, managing operator, master, or individual in charge shall make a shipping agreement in writing with each seaman before the seaman commences employment."
[4] State court jurisdiction is available pursuant to the savings to suitors clause. 28 U.S.C. § 1333. See Stanton v. Bayliner Marine Corp., 123 Wash.2d 64, 82, 866 P.2d 15 (1993); Scudero v. Todd Shipyards Corp., 63 Wash.2d 46, 48, 385 P.2d 551 (1963) (stating that "the substantive rules of the maritime law apply to the action whether the proceeding be instituted in an admiralty or in a common law or state court").
[5] The seaman is also entitled to unearned wages that he would otherwise have earned from the period of the onset of the injury or illness until the end of the voyage.
[6] We can certainly take notice that food and lodging costs in the Pacific Northwest generally far exceed a rate of $8 per day. Indeed, it would be quite difficult to find minimally adequate food and lodging at a rate of $8 per day anywhere in the United States. Two commentators have noted:

The poverty threshold for 1995, for an adult under the age of 65 and living alone, the appropriate description of most seamen, was $7,929. This threshold applies to all persons fitting the category, regardless of region or residence. In contrast, an injured or ill seaman receiving the $8 per diem rate, would be attempting to exist on an income of only $2,920 per yearsubsistence representing barely one third of the poverty rate! To survive on such an amount, insufficient for either food or lodging, an injured or ill seaman would be forced to seek welfare assistance, or the charity of family or friends, if available.
Eugene A. Brodsky & Karen M. Houston, From Subsistence to Starvation: A Call for Judicial Reexamination of Gardiner v. Sea Land Service, Inc., 9 U.S.F. MARITIME L.J. 71, 81 (1996) (footnotes omitted).
Further, Washington's own industrial insurance act pays temporary total disability (time loss) at a rate based on the monthly wage, or the daily wage of the injured worker multiplied by the number of days per week the worker was normally employed, an enormously more generous amount than $8 a day, and far more reflective of the actual costs incurred by an injured worker stranded in a foreign port away from home. RCW 51.08.178.
[7] Congress has, of course, created rights for injured seamen, such as the Jones Act (46 App. U.S.C.A. § 688) (1998), and for the personal representatives of seamen, 46 App. U.S.C.A. § 761 (1998) (Death on the High Seas Act). Jones Act claims require proof of negligence, while maintenance claims do not. Silmon v. Can Do II, Inc., 89 F.3d 240, 242 (5th Cir. 1996).
[8] See, e.g., FLA. STAT. ANN. § 440.21(2) (1998); MASS. GEN. LAW ANN. ch. 152, § 46 (1998); N.Y. WORK. COMP. LAW § 32 (McKinney 1998); R.I. GEN. LAWS § 28-33-26 (1998); TEXAS LAB.CODE ANN. § 406.035 (West 1998); W. VA.CODE § 23-2-7 (1998); Bell v. General Am. Transp. Corp., 52 Ala.App. 123, 290 So.2d 184 (1973); Mandle v. Kelly, 229 Miss. 327, 90 So.2d 645, 648-49 (1956) ("We think the overriding consideration in applying compensation statutes is the public interest rather than private contract."); Schneider v. Salvation Army, 217 Minn. 448, 14 N.W.2d 467, 470 (1944) ("An employee entitled to compensation cannot contract away that right."); Micieli v. Erie R. Co., 131 N.J.L. 427, 6 Abbotts 427, 37 A.2d 123, 124 (1944) (agreement purporting to relieve employer of liability under Workmen's Compensation Act declared void as matter of public policy).
[9] Keystone's in-house counsel, Ralph G. Hill, stated in a declaration filed in support of summary judgment that "Keystone employs its seaman on a voyage-by-voyage basis rather than for a pre-set length of time." Clerk's Papers at 481. Hill stated Keystone uses this method because:

"First ... Keystone does not know far in advance what voyages the ship's charterer will require for its cargo operations. Second, different voyages take different amounts of time to complete, depending upon the geographical distance between the load and discharge ports. Third, a variety of events such as shoreside facility delays, bad weather at sea, and the like can interrupt and delay voyages. Such events cannot be predicted in advance.
Clerk's Papers at 481. Hill also stated each trip of one of Keystone's ships "from one port to another port for cargo transfer operations is a completed voyage." Clerk's Papers at 481.
[1] In addition, the California Court of Appeals considered the same issue that is before us and, citing the Ninth Circuit's decision in Gardiner, enforced a $12 maintenance rate that was provided for in the CBA before that court. See Da Silva v. Pacific King, Inc., 195 Cal.App.3d 1, 9, 240 Cal.Rptr. 395 (1987) (holding that the trial court "acted properly" in instructing the jury to only award the plaintiff maintenance at the rate specified in his contract).
[2] In Gardiner, the Ninth Circuit Court of Appeals reasoned that "the national labor policy of encouraging the use and reliability of collective bargaining agreements, together with the realistic give and take occurring within the collective bargaining process, justify enforcement of the specified rate of maintenance contained in the agreement here." Gardiner, 786 F.2d at 950. Moreover, the court held that "[o]ur national labor policy is built on the premise that employees can bargain most effectively for improvements in wages, hours, and working conditions by pooling their economic strength and acting through freely chosen labor organizations. Consequently, this court will not lightly embrace the repudiation of contractual obligations enumerated in a collective bargaining agreement and will `choose the rule that will promote the enforcement of collective bargaining agreements.'" Gardiner, 786 F.2d at 948 (emphasis added) (citations omitted) (quoting in part Toyota Landscape Co. v. Building Material & Dump Truck Drivers Local 420, 726 F.2d 525, 528 (9th Cir.1984)). Significantly, as previously noted, the First, Fifth, and Sixth Circuits have each explicitly agreed with the holding in Gardiner. See Baldassaro, 64 F.3d at 212-13; Al-Zawkari, 871 F.2d at 588; Macedo, 868 F.2d at 522.
[3] The following list contains examples of the benefits that the CBA mandated that Keystone provide to its seaman: several designated holidays; overtime, penalty, and holiday pay; a yearly cost of living increase; a "Pension and Welfare Plan" (CP at 86); a television set with at least a 21-inch screen; an entertainment system available to the television (or movie projector and screen) that can show full length feature films, which the shipowner will exchange on a reasonable basis; bathing towels, soap, mattresses, linens, blankets, pillows, and matches; a washing machine, dryer, iron and ironing board; a messroom apart from the sleeping quarters which includes a clock, an electric refrigerator, toaster, dishes, and tables; a radio; and designated times for coffee breaks.
[4] Significantly, Lundborg has not alleged that the CBA as a whole was unfair, or that his union failed to adequately represent him when it negotiated the CBA. In addition, the record contains no evidence that an unequal bargaining position existed between the NMU and Keystone. To the contrary, the record indicates that the maintenance rate, and the CBA as a whole, was freely negotiated between the NMU and Keystone.