## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CT-01124-SCT

*CASH DISTRIBUTING COMPANY, INC.*

*v.*

*JAMES NEELY*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 05/27/2004 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | KATHERINE S. KERBY |
| ATTORNEYS FOR APPELLEE: | J. DOUGLAS FORD |
| | RODNEY A. RAY |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED. THE JUDGMENT OF THE CIRCUIT COURT OF LOWNDES COUNTY IS AFFIRMED ON DIRECT APPEAL AND AFFIRMED IN PART, ADDITUR GRANTED, AND REVERSED AND REMANDED IN PART ON CROSS-APPEAL 01/25/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     James A. Neely sued his former employer, Cash Distributing Company, Inc. ("Cash"), claiming he was dismissed because of federally prohibited age discrimination.[1]  The jury returned a verdict in Neely's favor, and Cash appealed, urging us to either set aside the

---

[1] Neely also alleged several state causes of action which were dismissed.

verdict because Neely failed to rebut every nondiscriminatory reason offered at trial for the dismissal.[2] or to allow a set-off for the amount of retirement benefits paid to Neely subsequent to his termination. Neely cross-appealed, claiming he was entitled to additional damages.

¶2. A sharply divided Court of Appeals affirmed the trial court's decision as to Cash's appeal and affirmed in part and reversed and remanded in part as to Neely's cross-appeal. *Cash Distributing Co. v. Neely*, No. 2004-CA-01124-COA, 2006 Miss. App. LEXIS 6, at *24 (Miss. Ct. App. Jan. 3, 2006). Although we find the Court of Appeals reached the correct conclusion in this case, we granted certiorari to address the appropriate allocation of the burdens of proof (both production and persuasion) to be followed in our trial courts in employment discrimination cases.

## BACKGROUND FACTS AND PROCEEDINGS

¶3. Cash, is a regional Mississippi beer wholesale distributorship for Anheuser-Busch products, with offices in Starkville, Columbus, and Tupelo. The distributorship is a family-owned business founded in Columbus by the late Marvin and Emily Cash, whose grandson, Danny Cash ("Danny"), currently serves as CEO and equity owner. Cash operates pursuant to its distributorship agreement with the brewery, Anheuser-Busch ("the Brewery") in St. Louis, Missouri.

¶4. In 1973, Marvin hired Neely, who began a twenty-seven-year climb up the ladder at Cash. In 1996, Neely – who had served for ten years as Sales Manager – was considered for

---

[2] This onerous burden (which today we reject) was placed upon plaintiffs in employment discrimination actions by the United States Court of Appeals for the Fifth Circuit in *Wallace v. Methodist Hospital System*, 271 F.3d 212 (5th Cir. 2001), more fully discussed *infra*.

promotion to General Manager of Cash's Columbus operations. Marvin and his son, Mike Cash, who was the executive vice-president, voted in favor of promoting Neely, and Danny, who had just been named vice president, cast the sole dissenting vote.

¶5.   According to Danny, when his grandfather hired Neely, there was a casual attitude at Cash, and the rules set by the Brewery were often relaxed or ignored. However, in 1997, the Brewery began a new approach to raise its wholesalers up to a minimum standards level. The new approach involved "assessments" which included a visit to the wholesaler by a Brewery representative each spring. At the conclusion of the visit, the Brewery representative provided a list of deficiencies to be addressed. The Brewery then followed up with another visit in the fall to determine whether the identified problems had been addressed and alleviated.

¶6.   In April 1997, the Brewery's market manager visited Cash's Columbus operation for an assessment and provided a list of issues and problems to be addressed. Immediately after this visit, Danny issued a three-page, single-spaced memorandum to Neely pointing out these issues and demanded that Neely address them before the Brewery's follow-up visit in the fall. The topics listed included customer survey, employee survey, community involvement, standard operating procedures, employee training jacket, assessment manual main books, and steering team. The memo also addressed the need for a market plan.

¶7.   The following year, Marvin died, and Danny became Cash's CEO. He announced that, due to the new requirements imposed by the Brewery upon its distributors, he intended to strictly enforce the policies and rules. These changes included strict documentation

3

requirements[3] in preparation for the Brewery's periodic assessments and evaluations of Cash's operations.

¶8.     Danny began to require Neely to submit daily call sheets disclosing where he had been and what he had done each day, and to submit regular written evaluations of the employees who worked for him in the Columbus operation. Danny also instituted a "ride-with" policy, requiring managers (such as Neely) to ride in the truck and visit customers with Cash's salespersons. At trial, Neely testified he understood that the Brewery required these and other technological changes.

¶9.     Neely frequently failed to timely complete his duties as assigned by Danny, often refusing to complete them at all. In fact, Neely freely admitted at trial that he refused to do tasks for Danny that he often happily did for Marvin. Danny's father, Mike, testified that Neely simply did not want to take orders from Danny. Despite being ordered to provide monthly evaluations on employees, Neely refused to do so. Neely testified that he might have submitted three evaluations on one of the employees from June 14, 1996, to March 3, 2000. Danny abandoned his efforts to obtain the required monthly evaluations, and he directed Neely to provide quarterly evaluations. These Neely also refused to complete. He also declined to use the required tracking forms to prevent out-of-date beer from being sold by Cash's customers.

¶10.    Danny's evaluations of Neely included both criticism and praise. For instance, in the January evaluation, Danny told Neely he needed to work with team leaders on setting up on-

_____

[3] Part of the required documentation was a tracking form for beer products used to detect any out-of-date beer in the market.

4

premises promotions. In Neely's February evaluation, Danny stated, "[k]eep up the great job of reducing expenses." Danny's August 1998 evaluation of Neely began with praise: "The accounts I did visit looked really good. We really dominated the cooler displays and other aspects of the business. The trucks have looked good rolling down the road and the warehouse has been clean each time I visited." However, later in the memo, Danny stated, "[i]n order to provide more value vs. 'twenty years of service' the positions need to keep adding abilities, not seniority. This is not a social security system."

¶11.    In the "game plan" for 1999 – while Neely was the general manager of Cash's Columbus operations – Danny stated, "I'm very pleased with the overall direction the impact has given the Columbus operation." Then, in a document Danny prepared called "Jim Neely Time Line," when referring to an employee named Tony Carley who worked for Cash, Danny noted, "[h]e was later promoted to supervisor and actually did most of the work for the other too [sic] much older supervisors that were riding their time out."

¶12.    In early 2000, Neely rode with one of his salesmen, Mickey Lewis, to visit his accounts. After the visits, neither Lewis nor Neely reported finding any out-of-date product at the customer locations. Soon thereafter, on March 3, 2000, Danny called Neely into a conference and terminated his employment with Cash, replacing him with Carley who, at that time, was 38 years old.

¶13.    Neely filed suit against Cash in the Circuit Court of Lowndes County, alleging violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 ("ADEA"),[4]

---

[4] The ADEA is a federal statute. The employee's case in the Lowndes County Circuit Court alleged the additional state causes of action of breach of employment contract, emotional distress, and libel/slander. The trial judge granted summary judgment in favor of the employer on all the

and at the conclusion of the trial, the jury returned a verdict for Neely and awarded him $120,000.00 in back pay. The jury also found that Cash's violation of the ADEA was not willful.

¶14. Cash filed various post trial motions, including a motion for judgment notwithstanding the verdict. Neely also filed post trial motions, including a motion for an additur or, in the alternative, a new trial on damages, as well as a motion for prejudgment and post-judgment interest, attorney fees, and costs. The trial court denied all post trial motions.

¶15. Cash timely perfected its appeal, claiming it was entitled to judgment notwithstanding the verdict because Neely failed to rebut all of the nondiscriminatory reasons Cash presented at trial for his dismissal, and that, in any case, the verdict should be offset by $208,896.66 in retirement benefits paid to Neely after he was terminated. Neely cross-appealed, claiming as error the trial court's refusal to grant him an additur or new trial on damages, front pay, prejudgment and post-judgment interest, costs, and attorney fees.

¶16. In a majority opinion written by Judge Irving on behalf of a five-judge majority, the Court of Appeals affirmed the trial court on Cash's direct appeal and affirmed in part Neely's cross-appeal, conditioned on Cash's acceptance of an additur in the amount of $58,754; however the majority reversed and remanded on the trial court's failure to grant prejudgment interest, post-judgment interest, loss of insurance benefits, front pay, and attorneys' fees. *Cash Distributing*, 2006 Miss. App. LEXIS 6, at *24.

---

state law matters. However, the trial judge refused to grant summary judgment in favor of the employer on the ADEA issue, leaving only the ADEA claim to be tried. Following the election of a new trial judge in Lowndes County, the employer filed a motion for reconsideration of its motion for summary judgment on the ADEA issue. The new presiding trial judge also refused to grant summary judgment in the employer's favor on the ADEA claim.

6

¶17.    Judge Griffis, joined by two judges, dissented, pointing out that the record included no direct evidence of age discrimination, because Danny's memos containing age-related comments, when viewed in context, were unrelated to any discriminatory purpose. *Id.* at *25 (Griffis, J., dissenting).  Cash petitioned this Court for a writ of certiorari, which we granted.

## DISCUSSION

## I.

¶18.    In 1967, the United States Congress passed the ADEA, which "prohibit[s] arbitrary age discrimination in employment."  29 U.S.C. § 621(b).  Specifically, the ADEA makes it "unlawful for an employer to . . . discharge any individual . . . because of such individual's age."  *Id.* § 623(a)(1).

¶19.    A plaintiff wishing to establish an employer's liability for violation of the ADEA may bring the claim in state or federal court.  *Id.* § 626(c)(1).  When a plaintiff brings an ADEA claim in our state courts, we are bound to apply the law as interpreted by the United States Supreme Court.  *See, e.g.*, **Saunders v. Mullins**, 412 So. 2d 245, 246 (Miss. 1982).[5]

¶20.    In setting forth the standard of review for this case, we borrow the following from the Court of Appeals:

> When reviewing the denial of a motion for judgment notwithstanding the verdict, we consider the evidence in a light most favorable to the non-moving party (in this case, Neely).  We also give the non-moving party the 'benefit of all favorable inference [sic] that may be reasonably drawn from the evidence.' *3M Co. v. Johnson*, 895 So. 2d 151, 160 (¶30) (Miss. 2005) (quoting *Munford, Inc. v. Fleming*, 597 So. 2d 1282, 1284 (Miss. 1992)).  We will reverse only

---

[5] However, state supreme courts are not duty-bound to follow a federal court of appeals' interpretation of federal law.  This fact will be discussed *infra*.

7

if the evidence 'points so overwhelmingly in favor of the moving party [in this case, Cash] that reasonable jurors could not have found in favor of the non-moving party. *Id.*

***Cash Distributing***, 2006 Miss. App. LEXIS 6, at *3.

**II.**

¶21.     In bringing an ADEA claim, the plaintiff must follow a precise scheme, or allocation, of the burdens of proof (both production and persuasion).  Our analysis of these burdens and their application in this case must begin with a review of United States Supreme Court precedent.

¶22.     In ***McDonnell Douglas Corp. v. Green***, 411 U.S. 792, 800, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), the Supreme Court squarely addressed what it called the "critical issue" of "the order and allocation of proof in a private, non-class action challenging employment discrimination."  The ***McDonnell Douglas*** Court explained that "[t]he complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial[6] discrimination. . . . The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  **Id.** at 802-03.  If that burden is met, the employee must then "be afforded a fair opportunity to show that [the employer's] stated reason for [the employee's] rejection was in fact pretext."  **Id.** at 804.

---

[6] Although ***McDonnell Douglas*** involved a claim of racial discrimination, its pronouncement has been applied to other employment discrimination cases, including ADEA cases. *See, e.g.*, ***Reeves v. Sanderson Plumbing Prods., Inc.***, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

8

¶23.    Eight years later, the Supreme Court provided additional explanation in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). The *Burdine* Court began by restating its holding in *McDonnell Douglas*:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' [*McDonnell Douglas*, 411 U.S.] at 802. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.* at 804.

*Burdine*, 450 U.S. at 252-53. The *Burdine* Court then clarified *McDonnell Douglas* by explaining that

> [t]he nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. The *McDonnell Douglas* division of intermediate evidentiary burdens serves to bring the litigants and the court expeditiously and fairly to this ultimate question.

*Id.* at 253 (internal citations omitted).

¶24.    Where a plaintiff establishes a prima facie case, discrimination is presumed unless the employer provides a nondiscriminatory explanation for the adverse employment action. This is so because the acts establishing the prima facie case, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Co. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978).

¶25.    The *Burdine* Court went further to state that "[i]f the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court

9

must enter judgment for the plaintiff because no issue of fact remains in the case." 450 U.S. at 254. However, where the employer does "carr[y] [its] burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Id.* at 255.

¶26. The foregoing is a fair statement of the United States Supreme Court's guidance on the subject as of 1981. The question which remained unanswered, however, was whether a Title VII plaintiff who presented a prima facie case, but offered no rebuttal to nondiscriminatory reasons offered by the employer, could nonetheless prevail. We find the confusion related to this question arises from some courts' misreading of the Supreme Court's holdings in *McDonnell Douglas* and *Burdine*. There appears to be an inconsistent understanding and application of the concept of rebutting the employer's nondiscriminatory explanation for terminating the aggrieved employee.

**III.**

¶27. We do not read *McDonnell Douglas* and *Burdine* to require a Title VII (or ADEA) plaintiff to rebut with specific evidence each and every nondiscriminatory reason offered by an employer for the termination. We do read them to say that "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination". Burdine, 450 U.S. at 253 (citing *McDonnell Douglas*, 411 U.S. at 804). Requiring courts to provide this opportunity is, we think, quite different from saying that the plaintiff must present specific rebuttal evidence as to each nondiscriminatory reason for the dismissal.

10

¶28.    The confusion, as demonstrated by the briefing provided to us in this case, arises from *Wallace v. Methodist Hospital System*, 271 F.3d 212 (5th Cir. 2001). In *Wallace*, the United States Court of Appeals for the Fifth Circuit held that, once an employer provides evidence of a nondiscriminatory reason for the plaintiff's termination, "'the plaintiff must produce substantial evidence of pretext.'" *Id.* at 220 (quoting *Auguster v. Vermillion Parish Sch. Bd.*, 249 F. 3d 400, 402 (5th Cir. 2001)).[7] *Wallace* next states that "[t]he plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates." *Id. Wallace* cites two additional Fifth Circuit cases and one case from the Court of Appeals for the Seventh Circuit for the proposition that a plaintiff "'must present facts to rebut each and every legitimate non-discriminatory reason advanced by [her employer] in order to survive summary judgment.'" *Id.* (quoting *Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1007 (7th Cir. 2001)).[8]

¶29.    We note that the Fifth Circuit's minority position that the employee rebut "each and every" nondiscriminatory reason proffered by the employer has been adopted by three other

---

[7] We are unable to find this requirement in any federal statute or United States Supreme Court case.

[8] Again, we are unable to find this requirement in any federal statute or United States Supreme Court case.

11

courts of appeals.[9] However, we are unable to find any statutory support for the proposition, nor do we find it espoused or approved by any decision of the United States Supreme Court.

¶30.    While this Court often defers to Fifth Circuit decisions interpreting federal law, we are under no obligation to do so.  *See, e.g.*, **State v. Montano**, 77 P.3d 1246, 1247 n.1 (Ariz. 2003) (Arizona Supreme Court finding it was not bound by the Ninth Circuit's interpretation of the United States Constitution); **People v. Dunlap**, 975 P.2d 723, 748 (Colo. 1999) (Colorado Supreme Court explaining it was not bound by Tenth Circuit's interpretation of federal constitutional requirements); **Stratos v. Dep't of Pub. Welfare**, 439 N.E.2d 778, 787 n.8 (Mass. 1982) (Supreme Judicial Court of Massachusetts finding that although the calculation of an award under § 1988 was governed by federal law, it was not bound to follow the method adopted by the First Circuit); **State v. Cody**, 82 P.3d 27, 30 (Mont. 2003) (Montana Supreme Court refusing to follow Ninth Circuit's interpretation of federal law, stating the Courts of Appeals "do not have appellate jurisdiction over the state courts and their decisions are not conclusive on state courts, even on questions of federal law"); **Lincoln Elec. Sys. v. Neb. Pub. Serv. Comm'n**, 655 N.W.2d 363, 371 (Neb. 2003) (Nebraska Supreme Court noting that while state courts are bound by the United States

_____

[9] Only three other Courts of Appeals apply this factor or a variation thereof: the Third Circuit, **Fuentes v. Perskie**, 32 F.3d 759, 764 (3d Cir. 1994) (stating "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action"); the Seventh Circuit, **Olsen v. Marshall & Ilsley Corp.**, 267 F.3d 597, 601 (7th Cir. 2001) (stating "a plaintiff cannot withstand summary judgment if he fails to create a triable issue of fact with respect to each of his employer's legitimate reasons"); and the Eleventh Circuit, **Chapman v. AI Transp.**, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (stating "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim").

Supreme Court's interpretation of federal law, they are not bound by circuit courts' interpretations); *Commonwealth v. Cross*, 726 A.2d 333, 338 n.4 (Pa. 1999) (Pennsylvania Supreme Court holding that it was not bound by Third Circuit decisions interpreting United States Supreme Court jurisprudence); *Lundborg v. Keystone Shipping Co.*, 981 P.2d 854, 862-63 (Wash. 1999) (Washington Supreme Court refusing to follow Ninth Circuit's interpretation of federal maritime law issue). We will not hesitate to take a different path where we conclude it is necessary to comport with controlling precedent from the United States Supreme Court.

## IV.

¶31. We find the plaintiff's burden of rebutting the employer's nondiscriminatory reasons for termination is clearly described by the following statement in *Burdine*:

> A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with the effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.

450 U.S. at 256 n.10. We are also persuaded by another United States Supreme Court decision which found the Fifth Circuit approach too restrictive. In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), the Supreme Court explained that the Fifth Circuit

> concluded that petitioner 'very well may be correct' that 'a reasonable jury could have found that [respondent's] explanation for its employment decision was pretextual.' Nonetheless, the court held that this showing, standing alone, was insufficient to sustain the jury's finding of liability: 'We must, as an essential final step, determine whether Reeves presented sufficient evidence

13

that his age motivated [respondent's] employment decision.' And in making this determination, the [Fifth Circuit] ignored the evidence supporting petitioner's prima facie case and challenging respondent's explanation for its decision. . . . [T]he [Fifth Circuit] proceeded from the assumption that a prima facie case of discrimination, combined with sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory reason for its decision, is insufficient as a matter of law to sustain a jury's finding of intentional discrimination. In so reasoning, the [Fifth Circuit] misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence.

(Internal citations omitted). The Court went on to specifically stress

'[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.'

*Id.* at 147 (quoting ***St. Mary's Honor Ctr. v. Hicks***, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (emphasis in original)).

¶32.   Cash argues that Neely failed to rebut every nondiscriminatory reason offered for his termination. We take Cash's argument to mean that Neely had to offer proof that each of the events Cash claims led to his dismissal did not actually happen. For instance, under Cash's view of the rebuttal requirement, once Cash asserts it terminated Neely because he refused to fill out certain forms, Neely must come forward with some proof that he actually did fill out the forms. It is this view of the rebuttal requirement that we find unduly restrictive and without foundation in any employment discrimination decision from the United States Supreme Court. Indeed, the language quoted above from ***Reeves*** that "[t]he fact finder's disbelief of the reasons put forward by the defendant" does not require the factfinder to disbelieve a particular event occurred, but rather requires the factfinder to find that – *even*

14

*if it did occur* – it was not the *motivating reason* for the dismissal. The jury in this case could very well have found that all of Danny's testimony about Neely's insubordination, while true, was not the real reason for Neely's dismissal.

¶33. Stated another way, we find the binding Supreme Court precedent requires only that Neely rebut Cash's nondiscriminatory reasons for the dismissal by persuading the jury that, true or not, the reasons offered by Cash were not the motivating reasons for his termination. Thus, Neely was free to admit that some or all of the wrongful acts attributed to him by Cash were true but were not the real reason for his dismissal.

¶34. It is not enough, of course, for Neely simply to make the claim. He must produce some proof which persuades the jury that the true reason for his termination was impermissible age discrimination. And because Neely did exactly that in this case, that is, he produced evidence which persuaded the jury that the real motivation for his dismissal was impermissible age discrimination rather than the reasons proffered by Cash, we must leave the jury verdict undisturbed unless we find that, viewing the evidence in the light most favorable to Neely, no reasonable, rational juror could have reached the same conclusion. *Janssen Pharmaceutica, Inc. v. Bailey*, 878 So. 2d 31, 54 (Miss. 2004).

## V.

¶35. In light of this precedent, we decline to follow the Fifth Circuit's view that an ADEA plaintiff must specifically rebut each and every nondiscriminatory reason offered by the employer its adverse employment action. Instead, we shall now fulfill our duty to set forth the test to be used in our state courts for determination of ADEA claims. This test is not new, but is simply a restatement of the test as pronounced and discussed in the United States

15

Supreme Court precedent cited herein, and a rejection of the test set forth by the Fifth Circuit in ***Wallace***.

¶36.    First, an ADEA plaintiff must establish a prima facie case by showing (1) he or she was a member of the class protected by the ADEA ("individuals who are at least 40 years of age," 29 U.S.C. § 631(a)), (2) he or she was otherwise qualified for the position, (3) he or she suffered an adverse employment action, and (4) he or she was replaced by a substantially younger person. ***Reeves***, 530 U.S. at 116-17; *see also* ***O'Connor v. Consol. Coin Caterers Corp.***, 517 U.S. 308, 313, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996).

¶37.    Once an ADEA plaintiff establishes a prima facie case (assuming the factfinder believes the facts establishing the prima facie case are true), a presumption arises that the employer engaged in impermissible discrimination,[10] and absent some response by the employer, judgment must be entered for the plaintiff.[11]

¶38.    If the employer responds by proffering nondiscriminatory reasons for the employment decision, the employee must be afforded an opportunity to submit additional[12] evidence that the nondiscriminatory reasons offered by the employer were pretextual, and that the employment decision was motivated by impermissible discrimination. ***McDonnell Douglas***,

---

[10] "[T]he prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" ***Burdine***, 450 U.S. at 254 (quoting ***Furnco***, 438 U.S. at 577).

[11] "If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." ***Burdine***, 450 U.S. at 254.

[12] We read the Supreme Court precedent cited herein to say that the evidence establishing the prima facie case may be viewed as evidence that the reasons for the employment decision offered by the employer were pretextual.

16

411 U.S. at 804-05. In responding to a particular nondiscriminatory reason proffered by the employer, the plaintiff may claim either that the event never happened at all, or that the event did, in fact, happen, but was not the true reason for the adverse employment decision. *Burdine*, 450 U.S. at 256. In either case,

> [t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.

*St. Mary's*, 509 U.S. at 511 (emphasis in original).

¶39. The plaintiff may, of course, offer additional evidence of discrimination, such as the employer's verbal or written comments indicating a discriminatory animus. The plaintiff may also offer additional evidence of pretext, such as evidence that the reason offered by the employer for the adverse employment decision also applied to other employees who were not subjected to the same punishment.

¶40. The jury must consider all of the evidence submitted at trial and determine whether the motivating factor for the employer's action was impermissible discrimination. In other words, even though several factors may have contributed to the adverse employment action, if the jury finds that the employee would not have been terminated or subjected to the adverse employment decision absent impermissible discrimination, the plaintiff should prevail.

¶41. This Court confronted the issue in *Columbus Paper & Chemical, Inc. v. Chamberlin*, 687 So.2d 1143, 1145 (Miss. 1996), in which a former employee brought an ADEA claim against his employer. This Court held that although the employee established a prima facie

17

case of discrimination, he failed to rebut all of the employer's age-neutral reasons for the termination. *Id.* at 1150. This Court also held that even if the employee had rebutted all of the employer's nondiscriminatory reasons, a reasonable jury could not have concluded that the termination was due to impermissible discrimination. *Id.* at 1153. To the extent we held in **Columbus Paper** that the employee was required to rebut each and every nondiscriminatory reason proffered by the employer for the termination, it is overruled. We now proceed to apply this test to the case before us today.

## VI.

¶42. Cash does not contest that Neely established a prima facie case of discrimination under the ADEA. Instead, Cash claims it discharged Neely for the nondiscriminatory reasons of insubordination and his failure to discover and report out-of-date product on a particular occasion while riding with a salesman. Neely might have claimed that this event never happened at all, which would have served as evidence to rebut Cash's proffered reason for termination. Had this happened, the jury would have been free to believe whichever version of the facts it found credible, and the matter would have proceeded to verdict.

¶43. Instead, Neely did not deny that most of the events claimed by Cash occurred. However, Neely offered substantial evidence that these events were not the reason for his termination. For instance, Neely offered evidence that despite Cash's claims of insubordination and poor performance, his operation in Columbus received perfect scores following several evaluations by the Brewery. Neely also offered evidence that out-of-date product was fairly common and that the extremely meticulous audit of his territory was unprecedented, amounting to (according to another witness) a "witch hunt."

18

¶44.    Additionally, Neely offered evidence showing that Danny possessed discriminatory animus toward him. This and other evidence of discrimination offered by Neely is fairly set forth in Judge Irving's majority opinion submitted on behalf of the Court of Appeals. *Cash Distributing*, 2006 Miss. App. LEXIS 6, at *6-9.

¶45.    The jury in this case obviously credited Neely's account of his dismissal and the evidence supporting it over explanations supplied by Cash. This Court has no basis to disturb that decision on appeal. The jury was free to find that even if, as Cash claimed, Neely had been insubordinate, that justification was pretextual based on evidence of unequal treatment, age-related statements made by Cash's CEO, and the impeachment of Cash's witnesses. As Judge Irving stated, "[t]he responsibility of determining what evidence is credible and what is not is the proper province of the jury." *Id.* at *6 (citing *Doe v. Stegall*, 757 So. 2d 201, 205 (Miss. 2000)). A motion for judgment notwithstanding the verdict must be denied where "there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions." *Alfa Ins. Corp. v. Ryals*, 918 So. 2d 1260, 1261 (Miss. 2005). Such is the case here.

¶46.    In *Reeves*, the United States Supreme Court held that the Fifth Circuit "impermissibly substituted its judgment concerning the weight of the evidence for the jury's." 530 U.S. at 153. We will not make that same mistake here, and we therefore find that the jury's determination of Cash's liability must be affirmed.

19

## VII.

¶47. We turn now to the remaining issues raised on appeal. After careful review, we find the Court of Appeals correctly disposed of those issues.

## CONCLUSION

¶48. We overrule *Columbus Paper* insofar as it requires an ADEA plaintiff to rebut each and every nondiscriminatory reason for an adverse employment decision proffered by the employer. We affirm the circuit court's judgment as to the two issues raised in Cash's direct appeal. As to Neely's cross-appeal on the issue of the adequacy of damages, we affirm the trial court's decision, provided that, within thirty days of the issue of the mandate, Cash accepts and pays an additur in the amount of $58,754. If Cash does not accept the additur, we order a new trial on damages only. We reverse the trial court's denial of Neely's claim for prejudgment and post-judgment interest, loss of insurance benefits, front pay, and attorney's fees, and we remand for further proceedings consistent with this opinion.

¶49. **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED. THE JUDGMENT OF THE CIRCUIT COURT OF LOWNDES COUNTY IS AFFIRMED ON DIRECT APPEAL AND AFFIRMED IN PART, ADDITUR GRANTED AND REVERSED AND REMANDED IN PART ON CROSS-APPEAL.**

**COBB, P.J., DIAZ, GRAVES AND RANDOLPH, JJ., CONCUR. CARLSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., AND WALLER, P.J. EASLEY, J., NOT PARTICIPATING.**

**CARLSON, JUSTICE, DISSENTING:**

¶50. Because the majority overrules this Court's precedent in addressing the critical issue before us in today's case, I respectfully dissent.

20

¶51. James Neely, a Columbus resident, had worked for Cash approximately 26-years beginning in late 1973 and concluding on March 3, 2000, with a one-time six month interruption in employment. The last position Neely held with Cash was General Sales Manager of the Columbus office, when he was 60 years old.[13] In 1996, Neely was promoted to General Manager at Columbus. Neely and Danny Cash had a turbulent relationship from the beginning. Marvin Cash and Mike Cash, Marvin's son and Danny's father, voted to promote Neely. Danny's vote was the sole vote against Neely's promotion. After Marvin's death in 1998, Danny became CEO and instituted major changes in accordance with the requirements of Anheuser-Busch. These changes included the company having an increase in forms and required documentation. Danny also required daily call sheets and regular written evaluations. This included a new tracking form for beer products which was used to detect any out-of-date beer in the market. Likewise, Danny instituted a "ride-with" requirement that managers ride in the truck with salesmen. Neely understood that Anheuser-Busch required these changes, including other technological changes.

¶52. Neely often refused to do his duties as assigned by Danny. In fact, Neely testified at trial that he refused to do tasks for Danny that he often happily did for Marvin Cash. Mike Cash testified that Neely did not want to take orders from Danny. Neely refused to use the tracking forms to prevent out-of-date beer from being distributed. Neely did not fill out and turn in his tracking sheets. Neely repeatedly acknowledged at trial that he outright refused Danny's directives.

---

[13]At the time of trial, Neely was employed as the sales manager for the local Miller brand products beer distributorship.

¶53. Despite his insubordination, Neely was again promoted to the position of General Sales Manager of the Columbus office in 1999. Neely was in charge of everything from ensuring the delivery trucks and warehouse were kept clean to fostering good relations in the Columbus office, budgeting expenses, building profitability, and meeting Anheuser-Busch requirements. Neely continued his pattern of insubordination to Danny.

¶54. Shortly after Neely was promoted to the position of General Sales Manager in Columbus, Danny hired Dennis Klier, at the insistence of Anheuser-Busch, to be the Vice-President of Cash. Klier's role was to oversee both the Columbus and Tupelo operations, which made Klier Neely's supervisor. Klier was hired six months before Neely's termination, and Klier left Cash shortly thereafter. Employees perceived Klier as having been hired to get rid of Neely. Klier required Neely to arrive at work at 6:30 a.m. instead of the usual 8:00 a.m. Additionally, Klier required Neely to do ride-withs on the delivery trucks in order to visit accounts, rather than follow behind the delivery truck in his car, even though Klier knew that Neely's doctor had warned him against doing ride-withs.

¶55. The "final straw" came when a vast amount of out-of-date beer[14] was discovered by Neely on a route that he was supervising. Neely had not done the required paperwork for the route. Three or four cases of out-of-date beer were commonly found on routes. However, on this route, at least 160 cases of out-of-date beer were found. This was an unprecedented amount of out-of-date beer on a route. In fact, employees testified at trial that this had never happened before and had not happened since then. The salesman for the route, Mickey

---

[14]Anheuser-Busch has a zero tolerance policy with its distributors for out-of-date beer. One of Anheuser-Busch's marketing tools for its beer products is its freshness. Thus, Anheuser-Busch deems it imperative that distributors ensure that the delivered beer is fresh.

Lewis, was fired. Lewis's immediate supervisor, Perry Bostick,[15] was demoted. Neely was fired. The Mississippi Employment Security Commission (MESC) deemed Cash's action to be inconsistent with its policies concerning out-of-date beer, and thus, finding no misconduct connected with his employment, the MESC awarded Neely unemployment benefits.

¶56. Danny repeatedly wrote Neely memos about his concerns with Neely's poor job performance. Also, although Neely met his sales targets, Mike Cash had counseled Neely about his refusal to follow Danny's directives. One memo that Danny wrote to Neely is entitled "August 98 Assessment." This memo stated, in pertinent part:

Jim,

************

I have given **several employees** a compensation survey. I am going to use the information you gave me last Friday along with the NBWA compensation study to make some determinations of our competitiveness within the market and the industry. **I want to develop a better way to base bonus and increases v. just time spent in any position.**

I have been thinking about the evaluation process and have determined that with the time invested in communications so far, we can go to quarterly reviews for all employees <u>except</u> salesmen and new employees. The salesmen should still be evaluated each month to cover impact, route books, sales, promotions, etc. New employees should be evaluated each month for the first six months then quarterly. This does not mean that communication between managers should decrease, only the need for a formal sit down evaluation. The quarterly evaluations should be far more in-depth than a 1-10 rating. I would like to see job specific questions and an area including what have you learned to do over and above your present position to provide more value and who have you trained to complete what tasks you are responsible for. **In order to provide more value vs. "twenty years of service" the positions need to keep adding abilities not seniority. This is not a social security system.** We need to use the evaluations to show each employee the total cost to the

---

[15]Coincidentally, Perry Bostick is Neely's son-in-law.

company vs. their take home pay. Also, when would be the best time to complete the evaluations? The end of each quarter or the last month of the quarter to discuss current quarter standings and plan the next quarter.

************

**I have not looked at the call sheets this month, I hope you have them up to date. I am aware of your continued market involvement, and this is a small detail that can't be overlooked.**

************

Please review this, sign it, make a copy, and send it back to me. Thanks!

(Emphasis added).

¶57. Neely relies on this memo to prove age discrimination. Other evidence that Neely produced at trial included a document (written by Danny), entitled "July 2000, Jim Neely Time Line." This document had been prepared by Danny after Neely's termination and in anticipation of a hearing before the MESC on Neely's claim for unemployment compensation benefits. I quote this document in its entirety:

> Jim was originally hired by my grandfather at a time when Anheuser-Busch required him to have a supervisor out in the market. His responsibility was to visit the customers and check behind the salesmen. He was to make calls on customers during the day and make trade calls at night. He was also the contact person for the brewery representatives when they came into the market.
>
> During the 1980's Anheuser-Busch sales really took off. Each year there was usually double digit sales increases nationwide. Jim is quick to say that he is the best thing that ever happened to Cash Dist. Co. because of these sales increases. Tupelo was also having these increases and actually began to out sell Columbus with fewer accounts and territory. Columbus followed the nationwide trends and the results are due to all employees, not just Jim. Jim never saw it that way.
>
> As we grew in size (sales and employees) we needed more supervisors and a sales manager to direct the supervisors. Jim was promoted to sales manager while some long term salesmen became supervisors. I can remember several problem employees over the years and Jim avoided managing them. He always put the big decisions off on my father or grandfather. Jim was quick

24

to take credit for positive things, but avoided responsibility of making decisions that involved problems. He rode the fence to remain popular.

Tony Carley started working for Coors when they first came to Columbus. He was a salesman with them. He kept trying to work for us, but he was a friend of my brother and granddaddy was hesitant. He was finally given a chance and became one of if not the top salesman. **He was later promoted to supervisor and actually did most of the work for the other two much older supervisors that were riding their time out.** Tony won numerous contests and was praised by the brewery. Tony was promoted to sales manager at the same time Jim was promoted to general manager in early 1996. This was the same time I became Vice-President and Equity Manager. Marvin was still president. **Tony performed most all of the functions required of himself and Jim.** Jim would pass the buck to Tony who was a highly motivated and determined employee. Jim would take credit though when something went right and pass the buck if it was an unpopular decision. I moved Tony to a position of chain sales manager for both Columbus and Tupelo in 1999. The purpose was to give him experience out of his comfort zone of Columbus. Also he was still highly motivated and I wanted him to work with the Tupelo employees and rub off on them if possible. This made Jim the general sales manager for Columbus, a position identical to the current general sales manager in Tupelo. The general sales manager in Tupelo develops contests, types his own evaluations, leads sales meetings and manager meetings, fills out all required documentation as requested. **I had previously asked Jim to type some of the information he hand wrote, but his crippled fingers[16] would not let him. A few months later he had gotten an internet account at home and joined a chat club. Miracles do happen. He never typed anything at work and never used a computer to generate sales reports himself. The general sales manager in Tupelo who is an older man designs his own forms and creates numerous items on the computer. Jim never wanted to learn how to use the ones we had at work.** I was actually combining two positions into one like Tupelo to make Jim more hands on with the actual managing of the employees and customers like he was being compensated to do. Tony would still work with Jim in dealing with chain accounts in Columbus. Tony continued to lead the sales meetings.

Jim, as general sales manager, would be required to evaluate the supervisors instead of Tony continuing to do so. **Jim never completed the first one.** Jim would be required to develop team leader (supervisors) focuses like Tony had

---

[16]Danny testified that Neely often referred to his "crippled fingers" and that he was simply calling them what Neely called them.

been doing. **Jim never did this and they actually started doing their own and Tony began to help them again**. Jim would be required to develop sales contests, **but he passed the buck on that also**. Dennis Klier, the person I hired as my Vice-President to help me run both the Columbus and Tupelo offices, **had counseled Jim on several of these points**. I will get copies of those for you in the mail. The week all of the problems came to light about the old beer, Dennis had plans to discipline Jim on some issues and give him time off without pay. **The timing led to Jim's dismissal instead.**

The evaluations I completed with Jim starting in 1996 show that I had to constantly repeat my request for him to follow my guidelines. I went from Vice-President to President when Marvin passed in 1998. My leadership style was a lot different than Marvin and Mike's had been. I believe in direct accountability and compensation is based on current performance vs. past performance. Jim is quick to point out that when he was promoted to general manager in 1996 there were two votes for him and one against. The two for him were Marvin and Mike while the one against him was me. He is very correct in this statement. I knew Jim's track record and knew that he had no respect for me. I had seen him fail to make tough decisions when needed and he was not the leader I wanted to move Columbus forward. The evaluations show the constant strife between him and I regarding his performance. I could not be as effective as I needed to be due to the fact I was having to butt heads with him the entire time. Other employees saw this and it made them feel uncomfortable. They tried not to get caught in the middle.

Jim was required to ride on the route truck performing what is called a ride-with. Jim hated having to do this and he made a mockery of it by polling the salesmen in the morning of who was going to be back at the warehouse the soonest. He mostly rode with Mickey Lewis on the on-premise route that sold the least amount of product. This is the salesman that was fired due to excessive amounts of out-of-date product. Mickey's team leader was Perry Bostick, Jim's son-in-law. Jim favored Perry and his employees most of the time. They looked out for each other. The team leader, Perry, was also required to perform ride-withs with each of his salesmen each month. Another member of management could complete the requirement for them to help out and give another set of eyes out in the market. Jim volunteered to do this for Perry in late February. Jim went with Mickey Lewis and **visited most of the accounts the old product was found in a week or two later. This showed a gross negligence on Jim's behalf since his reason for doing a ride-with was to train, assist, and check behind the salesman.** Also, we had a brewery grading scheduled for February 28 in Columbus. Old beer was a main factor every time a brewery representative came to town, but especially during a grading. **Jim just refused to do his job and had a total lack of respect**.

Jim assumed Perry's responsibility when he performed the ride-with for him. Also, **Jim had not been completing the required evaluations on the team leaders; therefore, Perry had not been given proper supervision in my eyes.** Perry was demoted to salesman on the route previously run by Mickey Lewis. This was a strategic move on my part to prevent the customer relations we had built with both Perry and Mickey from being totally lost. This would have put us at a competitive disadvantage. The demotion was a big form of discipline to Perry and has was [sic] definitely chastised for his poor performance with Mickey. **Jim was terminated due to a combination of things. The failure to discover the huge amount of old beer was the last straw, but the continual refusal to make and document calls in the market along with his lack of completing required tasks such as performing evaluations on the team leaders and giving them a monthly focus led to an undesirable working environment.** The brewery has requirements of me and I pass them down to my managers. They are required to follow those requirements just as I am. The only way we can remain number one is by teamwork. I felt as though Jim was always pulling in the other direction and undermining what I was trying to accomplish. This was evident to the other employees and it made them feel very uncomfortable.

I hope this gives you an overview and anything else you need just give me a call. I still can't locate the ruling of the unemployment hearing. I did receive notice the appeal was negated. I will have Dennis Klier forward copies of evaluations he completed with Jim.

Thanks,
Danny Cash

(Emphasis added).

¶58.  In my opinion, the dispositive issue in today's case is whether a plaintiff in an age discrimination case is required to rebut each nondiscriminatory reason offered by an employer for termination. Finding that this Court has previously addressed this issue and answered this question in the affirmative, I would simply follow this Court's precedent and reverse the judgments of both the trial court and the Court of Appeals, and render judgment here in favor of Cash, inasmuch as Neely failed to rebut each of Cash's nondiscriminatory reasons for termination.

¶59.  We were called upon to address this specific issue in ***Columbus Paper & Chemical, Inc. v. Chamberlin***, 687 So.2d 1143 (Miss. 1996).  In ***Columbus Paper***, John Chamberlin entered into a buyout agreement with his partners, Jimmie Nolen and Clanton Johnson, on May 27, 1987.  ***Id.*** at 1146.  According to their contract, Chamberlin would remain an employee at Columbus Paper.  The contract contained the following clause:

> Corporation and Seller hereby agree that Seller will continue in the employment of Corporation, and that the Corporation may terminate the employment relationship for cause at any time prior to January 27, 1990, and at will thereafter.

***Id.***  Coincidentally, January 27, 1990, was Chamberlin's sixty-fifth birthday.  ***Id.*** at 1147.  After much strife between Chamberlin, Nolen and Johnson, Nolen, on January 22, 1990, told Chamberlin to "finish up at the end of January according to our agreement."  ***Id.*** at 1146.  Chamberlin sued pursuant to the ADEA and testified "that he must have been terminated because of his age since he was terminated on his sixty-fifth birthday."  ***Id.*** at 1147.  However, Nolen and Johnson testified that "pursuant to the ... contract, it was their understanding that Chamberlin would leave the company on January 27, 1990.  ***Id.***

¶60.  As their nondiscriminatory reason for Chamberlin's termination, Nolen and Johnson presented evidence from Columbus paper employees who "testified as to various 'problems' they had with Chamberlin" since entering into the buyout agreement, which included Chamberlin "snoop[ing] in the files" and refusing to "use the order forms provided by the company."[17] ***Id.***  However, "Columbus Paper admitted that the reasons stated above were not

---

[17]The Columbus Paper representatives also testified that Chamberlin "monopolized the front desk area" and "he was opposed to upgrading equipment." ***Columbus Paper***, 687 So.2d at 1147.

the reasons they fired Chamberlin and Chamberlin admitted that none of his problems with Columbus Paper or with Nolen and Johnson were a result of his age." *Id.* This Court held:

> Chamberlin failed to rebut all of Columbus Paper's age-neutral reasons. The record indicates that the May 27, 1987, contract was entered into knowingly by both parties and Chamberlin had counsel look over the proposed agreement. It was at Chamberlin's behest that the January 27, 1990, termination "at will" date be placed in the contract. Nothing within the four corners of the contract indicates that this date, January 27, 1990, is Chamberlin's sixty-fifth birthday. Likewise, nothing in the record indicates that Columbus Paper sought the contractual authority to terminate Chamberlin on his sixty-fifth birthday. The May 27, 1987, contract clearly allows for the termination of Chamberlin "at will" after January 27, 1990, and Chamberlin does not dispute that the contract allows for his termination after this date.

*Id.* at 1150.

¶61. Subsequent to this Court's decision in *Columbus Paper*, the U.S. Court of Appeals for the Fifth Circuit decided *Wallace v. Methodist Hospital System*, 271 F.3d 212 (5th Cir. 2001).[18] In *Wallace*, Veronica Wallace was a staff nurse at Methodist's Medical Intensive Care Unit. Wallace became pregnant three times in three years. *Id.* at 215.

¶62. Instead of the regular forty-hour week, Wallace began working three twelve-hour shifts per week when she discovered that she was pregnant with her second child. *Id.* Donna Hahus, the head nurse, and Tory Schmitz, Wallace's supervisor, gave Wallace a lower score on her evaluation during her second pregnancy and stated that she gave an "impression that

---

[18]*Wallace* was a Title VII sex discrimination case involving a claim of employment termination based on pregnancy. "Title VII prohibits an employer from failing or refusing to hire or discharge an individual 'because of such individual's race, color, religion, sex, or national origin.' 42 U.S.C. § 2000e-2(a)(1). The ADEA proscribes similar treatment on the basis of age. 29 U.S.C. § 623(a)(1). The same evidentiary procedure for allocating burdens of production and proof applies to discrimination claims under both statutes." *Brown v. Bunge Corp.*, 207 F.3d 776, 781 (5th Cir. 2000). *See also Meinecke v. H & R Block*, 66 F.3d 77, 83 (5th Cir. 1995) (per curiam). Because the framework of the burden of proof for Title VII and the ADEA are identical, I find *Wallace* on point.

she is unconcerned with errors and omissions". *Id.* at 216. The evaluation noted Wallace's reduced schedule, and Hahus stated during their meeting discussing the evaluation that Wallace needed "to choose between nursing and family." Additionally, Schmitz informed Wallace that she did not know how to classify Wallace as an employee because of her reduced-hour status. *Id.*

¶63. One month before she was to take her third maternity leave, Wallace was terminated for a Class I willful violation.[19] *Id.* at 217-18. I refer here to the Fifth Circuit's assessment of Wallace's actions leading to the charge of a Class I violation.

> On December 19, 1994, Dr. Barrosa, a gastroenterologist, issued a written order for tube feeding to begin on Mr. B, a patient in the MICU. Under the order of Mr. B's attending physician, Dr. Kenneth Lloyd, Mr. B already had in place a Salem Sump, a large bore tube used for suctioning fluids from the stomach but which could also be used for tube feeding. Wallace knew that the Salem Sump could be used for feeding. Without an order to do so, even though one was required, Wallace replaced the Salem Sump with a feeding tube of a smaller diameter. She also wrote in the patient's record that she had received a verbal order from Dr. Nicola Hanania to put in the smaller bore tube. Dr. Lloyd discovered that the Salem Sump had been replaced. He did not want the Salem Sump removed because of Mr. B's medical problems. After checking the chart and seeing the order with Dr. Hanania's name affixed, Dr. Lloyd asked Dr. Hanania why he had ordered the tube change. Dr. Hanania informed Dr. Lloyd that he had given no such order. Dr. Lloyd then spoke with Wallace. At trial, Wallace admitted that she could have but did not contact a physician about Dr. Barrosa's order.

*Id.* at 216-17.

¶64. Soon after Wallace was terminated, another Methodist nurse overheard a clinical dietician inquiring of Schmitz as to why Wallace had been terminated and Schmitz responded

---

[19]According to the Methodist Hospital System due process policy, a Class I violation is defined as "a serious violation of System standards under circumstances that, after a thorough consideration of the facts, may justify termination for a first violation without regard to the employee's length of service or prior record of conduct." *Wallace*, 271 F.2d at 218 n.9.

"First of all, she's been pregnant three times in the last three years." Wallace filed suit pursuant to Title VII for sex discrimination based upon pregnancy. The case went to trial, and after the jury was unable to reach a verdict, the judge declared a mistrial. During the second trial, the district judge twice refused to grant a judgment as a matter of law ("JMOL") in favor of Methodist pursuant to Fed. R. Civ. P. 50,[20] and the jury returned a verdict for Wallace by awarding her $70,000 in compensatory damages and $437,500 in punitive damages. Methodist again moved for a JMOL, and the district judge granted Methodist's motion and dismissed the case with prejudice. *Id.* at 218.

¶65. In *Wallace*, the Fifth Circuit laid out the framework for a Title VII claim:

> JMOL is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."
>
> ************
>
> A plaintiff can prove intentional discrimination through either direct or circumstantial evidence. Where the plaintiff offers circumstantial evidence, the *McDonnell Douglas-Burdine*[21] framework requires the plaintiff to establish a prima facie case of discrimination, which, if established, raises a presumption of discrimination. The employer must then produce a legitimate nondiscriminatory reason for the adverse employment decision. Once the employer produces a legitimate nondiscriminatory reason, the presumption of discrimination dissipates. The plaintiff bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that the employer intentionally discriminated against her because of her protected status.

---

[20]Miss. R. Civ. P. 50 distinguishes between a motion for a directed verdict and a motion for a judgment notwithstanding the verdict; however, Fed. R. Civ. P. 50 eliminates the distinction between the two motions and instead refers to any such motion for judicial intervention by way of taking a case away from the jury, or setting aside a jury verdict, as simply a motion for a judgment as a matter of law.

[21]*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-56, 101 S.Ct. 1089, 1093-95, 67 L.Ed.2d 207, 215-17 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677-78 (1973).

"To carry that burden, the plaintiff must present substantial evidence of pretext." ***The plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates.*** A plaintiff may establish pretext "by showing that a discriminatory motive more likely motivated" her employer's decision, such as through evidence of disparate treatment, "or that [her employer's] explanation is unworthy of credence."

In considering a motion for JMOL, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Nonetheless, "whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for a judgment as a matter of law."

*Id.* at 218-20 (citations omitted) (emphasis added). The ***Wallace*** court held that Wallace had not rebutted the second nondiscriminatory reason for her termination – falsification of records. *Id.* at 222. Of significant import is the fact that the court found that Wallace had presented evidence to show disparate treatment by Methodist as to the first nondiscriminatory reason given by Methodist for her termination,[22] but Wallace failed in rebutting the second nondiscriminatory reason given by Methodist for her termination. Further, the ***Wallace*** court held that any offhand comments by Methodist employees were irrelevant and did not prove the second nondiscriminatory reason for her termination to be pretextual, because, among other things, Wallace admitted that she had falsified the medical records. *Id.* at 226.

---

[22]The first nondiscriminatory reason offered by Methodist for terminating Wallace was that Wallace had performed a procedure [insertion of a nasogastric tube into a patient] without a doctor's order; however, Wallace put forth evidence that a non-pregnant nurse had performed almost the identical procedure on a patient without a doctor's order, and the non-pregnant nurse was only verbally reprimanded by Schmitz and Hahus. ***Wallace***, 271 F.3d at 221. However, unlike Wallace, the non-pregnant nurse did not go further and falsify the medical records by indicating on the patient's chart that the procedure had been verbally ordered by a physician when, in fact, it had not. *Id.* at 221 n.13.

32

¶66.    I would therefore find, in accordance with this Court's decision in *Columbus Paper* and the Fifth Circuit's decision in *Wallace*, that Neely was required to rebut each nondiscriminatory reason offered by Cash.  A reasonable and fair-minded jury in the exercise of sound, honest judgment could have unquestionably believed that one of Cash's reasons for terminating Neely – the out-of-date beer issue – was pretextual because all of the involved employees were not disciplined in the same manner.  However, like the plaintiffs in *Columbus Paper* and *Wallace*, Neely admitted at least one nondiscriminatory reason offered for his termination – insubordination.  The following is a portion of the cross-examination of Neely by Cash's attorney:

> Q.  And these methods or new things you described–a method of tracking out-of-date beer and disposing of it, ride-withs you've described, daily call sheets you described, and the evaluations–those were the changes you've told the jury about today that came along with Danny, right?
>
> A.  Yes, ma'am.
>
> Q.  Okay. And as I understand your testimony today here to this jury, you have admitted that you didn't do the daily call sheets, posted, turned in as were you directed to by Mr. Danny Cash, correct?
>
> A.  Yes, ma'am.
>
> Q.  Okay.  And as I understand it, you've told the jury here today you were supposed to do evaluations of Mr. Tony Carley and Mr. Buddy Burks, right?
>
> A.  Correct.
>
> Q.  And you were told by Mr. Danny Cash to do those written formal evaluations on a monthly basis, correct?
>
> A.  Correct.
>
> Q.  That's up until mid 1998 when it was went (sic) to formal evaluations once a quarter, right?

A. I don't recall the exact date, but it was eventually changed to quarterly.

Q. Sure. But you have told this jury here today that you admit you did not do the written formal evaluations on the two employees that you were directed to do by Mr. Danny Cash?

A. Yes.

Q. So you admit that?

A. Yes.

*************

Q. But you do admit that there were numerous memorandums to you from Danny Cash talking about expectations of you, correct?

A. Yes, I agree.

Q. And a constant recurring theme was his direction to you to do these evaluations, correct?

A. Yes.

Q. And you constantly admitted through the years, even today, you didn't do them, correct?

A. Yes.

*************

Q. Yes, sir. And part of that is Marvin Cash lived in Columbus, and when we sent you to Tupelo, he needed (sic) to be his eyes and ears; is that correct?

A. That was his intention, yes.

Q. And in 1996 when Danny took over, he lived in Tupelo, didn't he?

A. Yes, he did.

Q. Still does?

A. Yes.

Q. Wasn't all he (sic) asking you to do to be his eyes and ears in Columbus?

34

A. Yes, and I was.

Q. But you never documented it as he requested in the daily sales calls, did you?

A. That's correct.

Q. Referring to Page 184 of your deposition, I asked you a question. My question: "Was there anything about your conduct that related to you leaving Cash?" Correct me if I read this incorrectly, sir. Answer: "In Mr. Cash's opinion, Mr. Danny Cash's opinion, I'm sure there was." My question to you: "What were those reasons?" Answer: "Lack of respect that he felt I had for him and several other things that you noted." My question to you: "You disagree with those reasons, correct?" "Yes." My last question: "But you know he believes them to be true, don't you?" What was your answer?

A. "Yes." To what was the question? The lack of respect that he felt I had?

Q. Right. You disagree with those reasons, correct?

A. That I disagreed with him that respect never–personal respect for Danny Cash never entered into anything I did, but he felt that it did from day one.

Q. And my question to you was, "But you know he believes them to be true, don't you?" You said, "Yes."

A. And I still agree with that answer.

Q. Although you disagree with the reasons he's given, you know he believes they're true, don't you?

A. Of course, and that's his prerogative.

¶67. These are but examples of Neely's numerous admissions as to his conduct, as revealed in the record. Furthermore, just as Chamberlin did in ***Columbus Paper***, Neely testified that even he (Neely) believed that Danny was acting based on his (Danny's) belief that Neely was a bad employee. In considering the submitted nondiscriminatory reasons given by Cash for Neely's termination, one nondiscriminatory reason which Neely never rebutted, but indeed

35

he confessed, was that of insubordination. Judge Griffis said it best in his dissent when this case was before the Court of Appeals:

> Here, the legitimate reason for Neely's termination – insubordination – was never eliminated. I conclude that no rational finder of fact could conclude that Neely's termination was based on his age and thus unlawful age discrimination. Neely never rebutted the claim of insubordination and did not testify that he had the subjective belief that he was unlawfully terminated due to his age. Therefore, I am of the opinion that Cash Distributing Company, Inc. was entitled to judgment as a matter of law because the record conclusively revealed that Neely's insubordination was a nondiscriminatory reason for Cash's decision.

*Cash*, 2006 Miss. Ct. App. LEXIS 6, at *61, ¶67 (Griffis, J., dissenting). I agree with Judge Griffis. In my opinion, the status of the record is such that, like Judge Griffis, I would find as a matter of well-established law that the evidence points so overwhelmingly in favor of Cash that reasonable and fair-minded jurors in the exercise of sound judgment could not have arrived at a verdict other than one in favor of the defendant, Cash Distributing Company, Inc. Thus, in my opinion, it necessarily follows that the trial judge erred in denying Cash's motion for JNOV. *3M Co. v. Johnson*, 895 So.2d 151, 160-61 (Miss. 2005) (citing *Jesco, Inc. v. Whitehead,* 451 So.2d 706, 713-14 (Miss. 1984) (Robertson, J., specially concurring)).

¶68. In sum, the record and the law requires that the judgments of the trial court and the Court of Appeals be reversed and that judgment be rendered here in favor of Cash Distributing Company, Inc. Because the majority finds otherwise, I respectfully dissent.

**SMITH, C.J., AND WALLER, P.J., JOIN THIS OPINION.**

36